IN RE ESTATE OF W. B. SMALL.

CARLETON SIAS et al., trustees, appellants, v. OLIVER EDMUND VAN ALYEA, Thomas Stevens Van Alyea, Norma Jenness Barlow, Melville C. Van Alyea, Miriam Van Alyea Steinke, Tommie Van Alyea, Jessie Alexander, and Leota Coburn, appellees.

No. 48183.

(Reported in 58 N.W.2d 477)

1210

1212

May 5, 1953.

Rehearing Denied September 25, 1953.

Pike, Sias, Butler & Hoxie, of Waterloo, for appellants.

Harris, Van Metre & Buckmaster, of Waterloo, for appellees.

BLISS, J.—The first five applicants, as named in the title, are nieces, nephews and a grandnephew of, and sole beneficiaries under the will of, Florence L. Small, deceased's widow, who died April 20, 1949. The two applicants last-named are sisters, and are nieces of, and the sole heirs-at-law of, the deceased, W. B. Small.

Dr. W. B. Small, of Waterloo, Iowa, executed his will on June 26, 1936. He died October 9, 1939, and his will was probated on October 23, 1939. He was survived by no relatives other than his widow and the two nieces above-noted. Doctor Small nominated his friends John S. Tuthill, J. E. Johnson, Robert W. Waite, and Carleton Sias as executors of his will and directed that they be appointed trustees to carry out the terms of the will, with power in the remaining trustees to fill any vacancies among them, with approval of the court. Mr. Sias and Mr. Waite alone qualified as executors, as the other two nominees predeceased the testator. On the petition of the widow, Mr. Sias and Mr. Waite, the two last-named, were appointed by the court trustees of the will on November 12, 1942, and thereafter qualified and have since performed the duties of trustees. The estate having been fully administered, the final report of the executors was approved and estate was closed, and the executors were discharged by order of the court on November 16, 1942.

The will of Doctor Small, after providing for some minor bequests, directed as follows:

"Item 5. All the rest, residue and remainder of my estate of every kind and nature, both real and personal, I give, bequeath and devise to the executors and trustees hereinafter named for the use and benefit of my wife, Florence L. Small, and I direct my said executors and trustees to pay to my said wife * * * the income from said property, and· in the event that they should find that her needs require the payment of a part of the principal in addition to said income that they are permitted to pay

her from my estate such additional amounts as in their opinion they consider just, proper and right.

"Item 6. Upon the death of my said wife, Florence L. Small, I direct that all property, both real and personal then remaining in my estate shall be held in trust as follows:

"I direct that my said trustees or their successors shall distribute annually or semi-annually as they may see fit, the income thereof to such persons and for such purposes as they may feel is directed by God the Father, Jesus Christ the Son and Holy Spirit, and as they believe would be acceptable to me and meet my approval were I able to give it, they to be at liberty to choose and change the beneficiaries as said trustees may from time to time unanimously decide, it being my desire, intention and direction that said fund shall continue permanently and forever, and only the income thereof shall be used for the disbursements herein contemplated, and nothing herein shall prevent said trustees from allowing said income to accumulate in the event they do not find a suitable beneficiary as herein stated.

"By way of explanation it is my desire that any disbursements made under this paragraph shall be made to persons who believe in the fundamental principles of the Christian Religion and in the Bible and who are endeavoring to promulgate the same."

The widow filed her written acceptance of the will, and during the approximately ten years that she survived Doctor Small the trustees, as provided by the will, paid her the income of the residuary estate and about $10,000 from the principal of the trust. At her death there remained in the control and possession of the trustees real and personal property of an approximate value of $70,000.

On June 3, 1949, the petitioners filed their application for judgment and decree declaring the trust provision invalid, and alleged the following reasons therefor, in substance, paragraph 7: (a) Incapability of enforcement by the court because the beneficiaries are impossible of ascertainment.

(b) The purposes to which the income shall be devoted are impossible of ascertainment by the court.

(c) The direction that the fund shall continue forever violates the rule against perpetuities.

(d) The direction to pay the income to such persons and purposes as the trustees believe would be acceptable to the testator is incapable of being performed and is invalid since neither the court nor the trustees can make a will for the testator.

(e) The trust cannot be performed and is therefore invalid since Item 6 does not specify how much of the income shall be devoted to "purposes" and how much to "persons."

(f) Persons who believe in the fundamental principles of the Christian Religion and in the Bible are impossible of objective ascertainment since what one believes is hidden in his mind.

(g) The trust requires no charitable purpose to be served, and does not name an ascertainable class.

(h) It is impossible for the court or the trustees to determine what persons are promulgating the fundamental principles of the Christian Religion and of the Bible because of the lack of widespread agreement as to what constitutes such fundamental principles.

(i) Assuming that there is a definitely ascertainable class who believe in such fundamental principles, the giving of money to its members selected by the trustees without regard to their financial need nor to the purpose to which they will devote the money does not constitute a charitable purpose nor promote the public welfare.

(j) Assuming that Item 6 is a valid private trust, it is void because it violates the rule against perpetuities.

Division I of the answer filed by the trustees to the application admits the first six paragraphs thereof, but denies the seventh, set out above, and each lettered subdivision. Division II of the answer alleged matters pertaining to the life of Doctor Small and the administration of his estate, the material portions of which we have stated herein. The reply of the applicants admits these allegations, but denies the enforceability and validity of the trust.

The burden of proof in the trial was on the petitioners, and their opening statement was as follows: "It is the position of the petitioners * * * that there is no competent evidence to be

1216

offered in this action. That the court may, under the law, take judicial notice of all matters necessary for the court to determine this case, so at this point the petitioners rest."

The records and files in the estates of Doctor and Mrs. Small were received in evidence by agreement subject to any objection, other than that of competency. The relationship of the petitioners to the deceased and his widow was admitted. To show the circumstances surrounding the deceased at the time of the execution of the will and as explanatory of Item 6, evidence concerning Doctor Small's life, character, work, church and kindred religious activities, charities and other endeavors was received subject to objections. This testimony was given largely by Mr. Cohagan, age 66, for trustees. The witness came to Waterloo in April 1920 as general secretary of the Y.M.C.A., in which position he continued for over twenty-one years before retirement. He affiliated in 1920 with the Grace Methodist Church at Waterloo, of which Doctor Small had been a member since 1890. Until the death of the doctor in 1939 the witness was closely associated with him in church and Y.M.C.A. work. The doctor was a member of the Y.M.C.A., a regular contributor to it financially, and greatly interested in its programs and endeavors. He was a member of the official board of the church, a generous contributor to all activities of the church, and a regular attendant of the church and Sunday School programs. The witness and Doctor Small were active in all financial campaigns for the general church budget, ministerial support and pensions, missions, and endowment funds for conference claimants. He contributed to Cornell College, the American Bible Society and the Moody Bible Institute. He contributed to the advancement of temperance in the use of alcoholic liquors as a beverage. He often discussed religious matters with the witness. He was interested in missions and the program of evangelism in the Methodist Church. Mrs. Small joined her husband in these activities. The doctor many times reaffirmed his belief in the "Articles of Religion and the Discipline of the Methodist Church", in the Fatherhood of God, his faith in Jesus Christ and the Holy Spirit. He was a man of great faith and believed that men were guided by God. He was a believer in the

Apostles' Creed. The records of the Grace Methodist Church of Waterloo show that Doctor Small joined the Church July 27, 1890, and was continuously a member until his death. There was no contradiction of, nor disagreement with, this testimony.

Other witnesses for the trustees were Dr. Charles S. Hempstead, District Superintendent of the Waterloo District of the North Iowa Conference of the Methodist Church, Dr. Miron A. Morrill and Dr. Russell Cole, President of Cornell College. All of them received high scholastic degrees in philosophy, sacred theology and kindred subjects. Each by education, teaching, service in the ministry, and other religious activities was eminently qualified to testify to the Bible and its lessons and the fundamental basis and principles of the Christian religion, and the life and teachings of Jesus Christ. We will not attempt to summarize their testimony. They testified that while all churches professing the Christian religion did not require the acceptance of some religious principles which other denominations did, yet all were in agreement on a great many principles of the Christian religion which were considered fundamental.

There was testimony by witnesses for the applicants, as learned as those who testified for the trustees, namely, Rev. Charles J. Gunnell, Rector of Christ Episcopal Church in Waterloo, Rev. W. D. Oetting, of the Immanuel Evangelical Lutheran Church in Waterloo, Rev. G. E. Melchert, pastor of Trinity Lutheran Church in Waterloo, Rev. Robert L. Ryerse, pastor of Walnut Street Baptist Church in Waterloo, Rev. Father Robert J. Spahn, chaplain to the Catholic students at Iowa State Teachers College, Rev. Charles Wm. Phillips, minister of the First Unitarian Church in Des Moines, and Dr. Lewis L. Dunnington, pastor of the First Methodist Church in Iowa City, that all denominations calling themselves Christian and professing and preaching the Christian religion do not subscribe to a single body of fundamental principles of that religion which are identical in every respect. Some include or reject a principle or principles, a tenet, or matter of doctrine, or form, ritual, or procedure, which one or more sects or denominations do not. But none of these witnesses denied the existence of a great many fundamental principles of the Christian religion constituting its

firm foundation, which all denominations of that faith accept. As we read the testimony introduced by plaintiffs and defendants it definitely appears that notwithstanding there have always been, and are now, differences of opinion among churches and their members, calling themselves Christian, respecting various matters of doctrine, methods or procedure, yet, there are expansive areas of agreement, and a sound core of basic religious Christian principles common to all churches in Christendom regardless of the denominations. As one witness expressed it:

"Each sect under its own rules and articles has to determine for itself what is fundamental, *with the limitation that it cannot proceed to destroy those great principles which are the foundation of the Christian faith.* * * * Roughly speaking, there has been no change in the fundamentals as I see them during almost 2000 years."

Another witness said:

"Each denomination may have other things which it considers to be important, but the central core of that right across the Church remains the same. * * * Both the Protestant and Catholic bodies adopted as their statement the Apostles' Creed. Now, of course, there may be many things upon which we differ, but as far as the basic principles are concerned there is agreement."

The record discloses that there are forty million people in the United States who belong to Protestant churches and twenty or more million who are members of the Roman Catholic Church. All of these churches and their members profess to be followers of Christ and the religion He founded. It would be strange indeed if all of these Churches and their members were not in agreement on many fundamental principles of the Christian religion, and of the Bible, whose words are the source and foundation of that religion.

The trial court stated in its conclusions of law that:

"Man is not endowed with power to fathom the mental processes or the conscience of his fellowman. Only by the unpermissible assumption of omniscience can the trustees purport to

execute the provisions of Item 6 of this will. Only by the unwarranted assumption of omniscience can any individual at the time representing the court presume to supervise the execution of the provisions of Item 6 of this will.

"Furthermore, any attempt either to ascertain or circumscribe the authority sought to be reposed in the trustees by this decedent in Item 6 of his will requires excursion into a metaphysical field that is, and should be, out of bounds for the court of an organized society of human beings founded upon the principle of separation of church and state.

"Item 6 does not with sufficient certainty and definiteness designate a reasonably ascertainable beneficiary to meet the requirement for the establishment of either a private or a charitable trust. Neither does it specify either a sufficiently certain or definite class to be benefited or a sufficiently definite and certain standard for the selection of beneficiaries from a class to meet the requirements for the establishment of a charitable trust. * * * Neither does it specify any use or benefit to which the income is to be applied by any beneficiary. It does not specify any clearly defined or reasonably ascertainable use. The only directions to the trustees are with respect to recipients and not as to the use of the income. Neither by express words nor necessary implication does it establish a fund for any charitable use. The purported trust with its provision that the fund 'shall continue permanently and forever' is therefore violative of the rule and statute against perpetuities. * * *."

Doctor Small had no direct heirs. When he prepared his will he first provided adequately for the care and comfort of his wife should she survive him. He had been a supporter and advocate of the Christian religion during his life, and he desired to provide for the continuance of that support from the residue of his estate after his death. He chose as trustees four trusted old friends who knew him and his aspirations intimately and whom he felt would carry on where he left off, and in the manner that he, as a good Christian, had done. All of them had been for years active members of the churches in Waterloo, including the First Methodist Church, the Walnut Street Baptist Church and the First Congregational Church. Of the trustees

nominated in the will who survived him and qualified, one was a Methodist banker and the other a Congregational lawyer.

It was a part of the testator's religious belief that human beings receive the guidance of God who live in a way pleasing to Him and in accord with His will. Speaking of the significance of the words in the will, " 'as they may feel is directed by God the Father,' " et seq., a witness testified: "I think the phrase refers to a well-known Christian belief that a devout man does enjoy guidance from God", which may be obtained in various ways, as "in prayer, meditation, in reading the Bible, Christian literature, in following the dictates of common sense, in conference with other Christians, in following what the Quakers call the Inner Voice or Inner Light."

Before analyzing Item 6, we refer to some established legal principles and definitions.

I. In Heald v. Johnson, 204 Iowa 1067, 1070–1072, 216 N.W. 772, speaking for the court, Justice Albert said:

"The term 'charity', while not susceptible of a complete definition, is a term of much wider significance when used in law than in common speech. In the case of Union Pac. R. Co. v. Artist, 9 C. C. A. 14 (60 Fed. 365), Judge Sanborn, quoting from Jackson v. Phillips, 14 Allen (Mass.) 539, 556, says: ' "A charity, in the legal sense, may be more fully defined as a gift to be applied, consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or *religion,* by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government." ' [Italics ours.]

"A shorter definition * * * is that given by Lord Camden, as follows: ' "A gift to a general public use, which extends to the poor, as well as the rich." ' 5 Ruling Case Law 292. * * * [pages 1071, 1072] The word 'public', when used in connection with charity, refers to the purpose and intent of the trust, as being for the benefit of the public in general, or for some object so general and indefinite in its character as to be deemed a

common benefit—and not to the method of its execution. A gift is a 'public' charity when there is a benefit to be conferred upon the public at large, or some portion thereof, or upon an indefinite class of persons. Such gift need not be open to everyone in the community, however. By the designation of a class in a community a charity becomes public. 5 Ruling Case Law 293."

See also Wilson v. First National Bank, 164 Iowa 402, 410, 412, 145 N.W. 948, 951, 952, Ann. Cas. 1916D 481; In re Estate of Cooper, 229 Iowa 921, 930, 931, 295 N.W. 448; 10 Am. Jur., Charities, sections 4, 5; 14 C. J. S., Charities, section 1(a), (b), (c), (d), (e), pages 410 to 415; Wendell v. Hazel Wood Cemetery, 3 N. J. Super. 457, 67 A.2d 219, 223; In re Estate of Nugen, 223 Iowa 428, 434–436, 272 N.W. 638 (there is no authority to construe a charitable trust to be void, if by law it can possibly be made good).

In the words of Judge Cooley, in Allen v. Duffie, 43 Mich. 1, 7, 4 N.W. 427, 431, 38 Am. Rep. 159, 162: "Charity is active goodness. * * * It was never doubted, so far as we know, that all the necessary or usual work connected with religious worship was work of charity. * * * and indeed in the very highest sense, charitable."

In Hinckley v. Thatcher, 139 Mass. 477, 478, 488, 1 N.E. 840, 847, 52 Am. Rep. 719, 725, 727, the bequest was "equally 'to the Authorized Agents of the Home and Foreign Missionary Societies to aid in propagating the Holy religion of Jesus Christ.'" The court said: "There is no doubt that a bequest to the two societies, 'to aid in the propagation of the Holy religion of Jesus Christ', is a good charitable bequest."

In 14 C. J. S., Charities, section 17, page 449, it is stated: "It is a general rule that a gift for a religious purpose is one for a charitable purpose; and in determining the validity of a charity, there is no distinction between the promotion of 'piety' and of 'religion', the two words being synonymous * * *." See also section 18 of 14 C. J. S.

In 10 Am. Jur., Charities, section 55, page 624, speaking of religion, the author states: "By the common assent of men in all time, it seems to be agreed that societies, or communities of individuals, having the cultivation of charity for their prin-

cipal object, are necessary, or at least proper, auxiliaries to its support and propagation. In a country like ours, where it is one of the fundamental canons of the political law that there shall be no established religion, and that government shall not actively participate in the support or dissemination of religion of any sort, all such societies—pious institutions of all sorts— must depend upon the eleemosynary contributions of individuals. This would seem to require that the law should esteem such contributions as in a peculiar degree charitable. Whenever the end is truly pious, the law must esteem donations to promote it as really charitable. It necessarily follows, therefore, that all gifts and grants in trust, for the support of public worship and religious instruction, or for the advancement of piety, are valid as charitable trusts, and will be carried into effect. * * *."

In section 56, page 625, of 10 Am. Jur., Charities, speaking of particular religious purposes, it is stated: "It also includes all devises or bequests intended to foster religious institutions and to aid in the propagation of religious doctrines. Of such a character is a devise or bequest for the advancement of the Christian religion. [Pennoyer v. Wadhams, 20 Or. 274, 25 P. 720, 11 L. R. A. 210; Re Hood (1931) 1 Ch. (Eng.) 240, 73 A. L. R. 1354–C. A.; Annotations: 4 Ann. Cas. 1139; Ann. Cas. 1914D 451, 452; 2 Am. Law Inst. Restatement, Trusts, section 371] A devise or bequest to aid in the dissemination of the Gospel at home or abroad, when the object is to be accomplished by the support of missions, a bequest to aid in the distribution of Bibles and other religious literature, and devises and bequests for the support of the ministry are recognized as gifts for charitable uses." See also 14 C. J. S., Charities, section 42(d), page 490 et seq.

Section 52, page 622, of 10 Am. Jur., Charities, states: "Charity in its legal sense comprises four principal divisions: * * *; (3) trusts for the advancement of religion; * * *. The American Law Institute * * * states that charitable purposes include: * * * (3) the advancement of religion; * * *. [2 Restatement, Trusts, section 368.]"

In re Estate of Durbrow, 245 N. Y. 469, 473 to 476, 157 N.E. 747, 748, 749, the will of the testatrix provided: " 'I direct my

executor or executrix * * * to distribute where he, or she as his successor or substitute, in his or her judgment shall consider it will be most effective in the advancement of Christ's Kingdom on earth.' " The devise was of the residue of her estate. Her next of kin contested the validity of the bequest as void for indefiniteness and uncertainty of purpose. In upholding the devise, the court said:

"Christ's Kingdom on earth is the community or whole body of Christ's faithful people collectively; all those who are spiritually united to Christ as the Head of the Church without regard to differences of creed or doctrine. Its cause is advanced in divers manners, conspicuously through the work of religious associations and educational and charitable institutions of a religious character. Such work is in its nature charitable and uncommercial. It is identified not only with the dissemination of Christian doctrine but also with the teaching of the young and the care of the sick under church auspices. Charity and education have thus ever been the handmaids of religion. By the terminology of evangelical Christianity, the bequest is one in aid of Christian work in its broadest sense; to carry Christ's message throughout the world; to care for the sick and to bring up the young under religious teaching; to promote the principles and practice of the Christian religion. For these purposes, the church seeks and obtains the eleemosynary contributions of the laity, not for private gain but for the aid of pious institutions and objects of every nature. The advancement of religion has ever been held to be one of the principal divisions of charitable trusts. (Morice v. Bishop of Durham, 10 Ves. Jr. 522, 531.) * * *

"The intention to make a gift for charitable and religious purposes pervades and dominates the whole bequest and the court will give it effect if it is possible so to do by the application of the most liberal rules of construction that the law will permit. * * *

"Broadness of scope and generality of purpose do not in themselves breed impossibility of execution. * * *.

"Such bequests should not be read in an antagonistic spirit to disappoint the general intention of the will. As Gray, J., said in Greene v. Greene, 125 N. Y. 506, 512 [26 N.E. 739, 741,

21 Am. St. Rep. 743] : 'The endeavor is to find a way of upholding the will, not of breaking it down; and thus, in every case the inherent purpose, if lawful, should be effectuated through what legal channels * * * may be open.'

"* * *. In the light of these decisions, words of unlimited discretion, inspired, when properly understood, with naught but unselfishness and religious purpose, readily may be, and should be, construed as being limited to suitable objects of charitable and religious gifts. The bequest is thereby preserved from destruction and devoted to the uses for which the testator intended it, rather than given to contentious next of kin. To hold this gift to be too indefinite and uncertain would be to disregard the elementary principles of the law of charitable uses. Its expressed purpose is to promote the cause of the Christian religion in the most general sense and it should be carried into effect accordingly."

■ II. "A gift for charitable purposes, being for objects of permanent interest and benefit to the public, may, according to the general rule, be perpetual in its duration, and is not within the rule against perpetuities." 10 Am. Jur., Charities, section 17, pages 596, 597 (citing numerous cases). See also the same volume, page 600, section 22 and page 610, section 37.

This is the rule, uniformly, in all jurisdictions, Mills v. Davison, 54 N. J. Eq. 659, 35 A. 1072, 35 L. R. A. 113, 55 Am. St. Rep. 594; Gray on Perpetuities, Fourth Ed., section 590; 1 Lewin, Trusts, 2011; 1 Perry, Trusts, sections 381, 384; Perin v. Carey, 24 How. (U. S.) 465, 495, 507, 16 L. Ed 701; Jones v. Habersham, 107 U. S. 174, 2 S. Ct. 336, 27 L. Ed. 401, 406; Beach, Wills, section 136; White v. Keller, 5 Cir., Miss., 68 F. 796, 801; 21 R. C. L. 328, section 62; Wendell v. Hazel Wood Cemetery, 3 N. J. Super. 457, 67 A.2d 219, 223, supra.

This court has repeatedly held that the rule against perpetuities does not apply to gifts, bequests or devises for charitable uses or purposes. Nor do they violate what is now section 558.68, Code of 1950. Phillips v. Harrow, 93 Iowa 92, 106, 107, 61 N.W. 434; Chapman v. Newell, 146 Iowa 415, 419, 125 N.W. 324; In re Estate of Cleven, 161 Iowa 289, 294, 295, 142 N.W.

986; Wilson v. First National Bank, supra, 164 Iowa 402, 412; Sisters of Mercy v. Lightner, 223 Iowa 1049, 1059, 1060, 274 N.W. 86, 92, wherein the court, speaking of our statute against restraint of alienation of property, said:

"However, gifts to charitable uses do not come within the prohibition of the rule. A charitable gift has been defined to be 'a gift to general public use which extends to the poor as well as the rich' and 'whatever is given for the love of God or for the love of your neighbor in the catholic and universal sense is a charitable gift.' [Citing decisions of this court.] The donation undertaken by the defendant was for a charitable use. * * * A donor of property for a charitable use may impose such conditions as he may choose, including a restraint on alienation."

Section 558.68, Code, 1950, is inapplicable for another reason. The property in the case before us has already vested in the trustees. Of the statute, we said in Lunt v. Van Gorden, 229 Iowa 263, 269, 294 N.W. 351, 355: "We have construed this section to the effect that it is not applicable where title vests in a trustee within the period stated in the statute. * * * So interpreted, the statute has no application here." See also Todhunter v. D. M., I. & M. R. Co., 58 Iowa 205, 206, 207, 12 N.W. 267; Phillips v. Harrow, 93 Iowa 92, 61 N.W. 434; In re Estate of Trimble, 234 Iowa 994, 997, 14 N.W.2d 673.

III. It is a well-recognized rule, uniformly followed by all courts, that gifts to charitable uses and purposes are highly favored in law, and will be most liberally construed to make effectual the intended purpose of the donor. This court has always been zealous in protecting the rights of beneficiaries of charitable trusts. As said by Justice Ladd in In re Estate of Johnston, 141 Iowa 109, 111, 119 N.W. 275: "Charitable gifts are strongly favored. The courts will carry them into effect if this can be done consistently with established rules of law. Indeed it is said that courts never construe a charitable bequest void unless it is so absolutely dark that they cannot find out the testator's meaning." See also In re Estate of Cleven, supra, 161 Iowa 289, 292, 293; Chapman v. Newell, supra, 146 Iowa 415, 422, 425 (Such trusts "are subject to the supervision of the

court, which will make such orders and give such directions as may be necessary to make certain that the substantial intent of the testator shall be faithfully observed." Page 427); In re Estate of Durham, 203 Iowa 497, 502, 211 N.W. 358, 361 (Courts "will never construe a charitable bequest to be void unless it is so absolutely clouded that they cannot discover the testator's meaning. Such seems to be the trend of our cases."); Klumpert v. Vrieland, 142 Iowa 434, 438, 121 N.W. 34, 36, speaking of the Statute of Charitable Uses, 43 Elizabeth, the court said: "In so far as the statute recognizes, defines or indicates what are 'charitable uses', it is part of the common law and undoubtedly has influenced the courts of this country in the direction of liberal construction of instruments which undertake to bestow charity."; Wilson v. First National Bank, supra, 164 Iowa 402, 409, in which the court said: "* * * but the doctrine that such gifts appeal to the favor of courts and will be given effect if consistent with law, and that to such ends the most liberal rules [of law] within the allowable limits of chancery jurisdiction will be resorted to, if necessary for their support, is so generally upheld and applied as to remove the question from the field of debate."; In re Will of Hagan, 234 Iowa 1001, 1007, 14 N.W.2d 638, 152 A. L. R. 1296; Beidler v. Dehner, 178 Iowa 1338, 1342, 161 N.W. 32.

In Jensen, v. Nelson, 236 Iowa 569, 571, 19 N.W.2d 596, 598, the court, speaking through Justice Garfield, said:

"In determining the meaning of Item F, we may properly take into consideration that the trust therein created is for a charitable purpose. * * * In ascertaining the meaning of a charitable trust, the language used is to be given a broad and liberal construction, favorable to its purpose. Charitable gifts are strongly favored by courts. * * * It is well established, even where no charitable bequest is involved, that if any testamentary provision is open to two constructions, one of which would render it void or inoperative, and another which would render it valid, the latter is always to be taken and the former rejected. * * * This rule is particularly applicable where a charitable bequest is drawn in question. An analogous rule is also frequently applied to bequests to charity. If there are two mean-

ings of a word, one of which will effectuate and the other defeat the testator's object, the court will select the former meaning."

See also In re Estate of Walden, 190 Iowa 567, 574, 180 N.W. 679; Hodge v. Wellman, 191 Iowa 877, 886, 179 N.W. 534; and In re Estate of Nugen, 223 Iowa 428, 438, 272 N.W. 638, 644 (where Justice Hamilton used language apropos in all of these cases, to wit: "It is contrary to the public policy of this state to indulge in strained construction of the provisions of this will in order to seek out and discover a basis for avoiding the primary purpose of the testator to bestow upon the town a charitable trust."). This thought was reaffirmed in Blackford v. Anderson, 226 Iowa 1138, 1175, 286 N.W. 735, and Lupton v. Leander Clark College, 194 Iowa 1008, 1016, 187 N.W. 496.

The above-noted decisions of this court are in accord with those of other courts. As said in 10 Am. Jur., Charities, section 12, page 593: "In the United States every intendment in favor of public charities and charitable trusts is made. * * * It is the fixed policy of the law to uphold charitable bequests and trusts as valid whenever possible [citing authorities]."; Thomas v. Bryant, 185 Va. 845, 40 S.E.2d 487, 169 A. L. R. 257; Mitchell v. Reeves, 123 Conn. 549, 196 A. 785, 115 A. L. R. 1114 (Trusts for charitable uses are to be sustained if it is reasonably possible to do so, and every reasonable intendment is to be made in order to uphold them and make them effective); State ex rel. Emmert v. Union Trust Co., 227 Ind. 571, 86 N.E.2d 450, 12 A. L. R.2d 836 (Courts strongly favor public trusts for charitable uses, liberally construe deeds and wills evincing a charitable purpose, and never declare them invalid if they can, by any possibility consistent with the law, be held valid).

In 14 C. J. S., Charities, section 11, pages 437, 438, 439, it is stated:

"In construing and applying the terms of an instrument creating a charitable trust, the intention of the donor or testator must be carried out as nearly as possible, * * * courts [must] consider charity as the substance. In ascertaining the meaning of a charitable trust, the language used should be given a liberal construction and one favorable to its purpose * * *.

"In general, the donor's intention *is to be determined from the instrument itself and the attendant circumstances. The terms used are not to be measured separately, but each is to be considered in its relation to the entire provision, and the general meaning of each restricted by its associations, and made subordinate to the main purpose.* * * * To aid in the construction, extrinsic evidence of the circumstances is usually admissible * * *. Evidence, otherwise competent, which tends to assist in the application of language of the will, which is clear and certain on its face, to the object contemplated by the will, may be admissible. [Sacred Heart Academy v. Karsch, 173 Tenn. 618, 122 S.W.2d 416; Dirlam v. Morrow, 102 Ohio St. 279, 131 N.E. 365; Carroll v. Cave Hill Cemetery Co., 172 Ky. 204, 189 S.W. 186] * * * All presumptions consistent with the language used are indulged to sustain a charitable gift, as shown above in section 6a." (Italics ours.)

Section 6a, noted just above, 14 C. J. S. 427 et seq:, states, with many cited authorities from many courts, that: "Charitable gifts and trusts are favorites of the law and * * * of courts of equity; and the courts will uphold or declare the validity of * * * such trusts and gifts if it is possible to do so consistently with established rules or principles of law. * * * Of two possible constructions, the court will adopt that one which operates to sustain the trust or gift."

Among the numerous decisions in the footnotes sustaining the text, we note a few comments: The courts take special care to enforce testamentary gifts to charity. It is the policy of the law to encourage gifts and devises for charitable purposes. Courts will protect charitable gifts from assault. Courts of equity possess enlarged powers in giving effect to trusts for charitable uses. Testamentary gifts for charitable uses will not be declared void if, by any possibility consistent with the law, they may be held valid. The beneficent intention and desire of the testator in providing for a public charity will not be defeated unless the courts are compelled to do so by manifest defects in the will or illegality in its execution. Charities will be enforced, if there is some pivotal point of definiteness by which, or through

which, they may be administered. The charitable character of a trust being made apparent, all doubts will be resolved in its favor. Testator's language should be construed in broad and liberal spirit in accordance with his intention, to uphold gift.

 IV. Charitable devises or bequests should be upheld when, construed in the light and spirit of the rules and decisions noted hereinabove, they are sufficiently definite with respect to their purposes and subject matter, and the classes to be benefited, to permit of enforcement by a court of equity. The certainty required is not to be construed as absolute, but in a relative sense as commonly applied in human affairs and relations. The general character or type of the charitable purpose chosen by the testator or donor, and the class of beneficiaries or recipients, being indicated in the instrument or made reasonably ascertainable, the administration of the details of the trust and the selection of the separate beneficiaries from the general class and the designation of specific amounts for distribution, may be committed, by the maker of the trust, to trustees. By giving this discretion to the trustees any uncertainty in the gift is clarified or eliminated, and it will be sustained by the court if it reasonably can do so. "Where * * * the donor or testator indicates generally a charitable purpose, together with the limits thereof, or fixes the means whereby they may be ascertained, the gift is sufficiently definite and certain as to purpose, even though there is an indefiniteness as to details, it being proper to leave the details of the administration and of the mode of executing the trust to be worked out by the trustee under the supervision of a court of equity." 14 C. J. S., Charities, sections 20 and 21, pages 453 to 456.

 It is necessary, only, that there be definiteness and certainty as to the particular class or group which is to partake of the charity, and not to the individuals thereof. As stated in 14 C. J. S., Charities, section 39, pages 474 to 477: "Indefiniteness of the ultimate beneficiaries is one of the characteristics of a public charity or charitable use; accordingly, uncertainty and indefiniteness as to the ultimate individual recipients are not by any means fatal to the validity of a charitable gift which in other respects is sufficient. * * * The class of persons to be

benefited must be definite. * * * and, where the class is selected with the particular objects of the donor's benefaction to be determined by the trustee appointed to administer it, a valid charitable trust is created * * *."

See also section 40 of 14 C. J. S., page 477, where it is stated: "Gifts are not void for uncertainty as to beneficiaries where the trustee or some other person is empowered to select the beneficiaries, and ordinarily, in such case, it is sufficient if the gift is to charities generally."

Statements similar to those stated above with many pertinent authorities may also be found in 10 Am. Jur., Charities, sections 82, 83, pages 643, 644; section 88, page 647. In section 90 of said volume, pages 649, 650, it is said: "The uncertainty that must exist in charitable trusts is reduced to a certainty if a definite class of beneficiaries is described and a mode is provided for the selection of the particular objects of the bounty. * * * The beneficiaries may be described as a class in such a mode that the trustees may sometimes be required to exercise some judgment or discretion to determine what persons belong to the class and, more often, to whom of the many persons belonging to the class the bounty of the donor ought to be extended." Idem, section 91 says "Restrictions as to either locality or numbers included in a class of beneficiaries are not necessary to the validity of a charitable bequest."

Numerous authorities are cited in the footnotes to the various sections from American Jurisprudence and Corpus Juris Secundum, referred to above, and we will not make specific reference to them. We call attention to an early case quite similar in its nature and facts to the instant case. It is Going v. Emery, 16 Pickering (Mass.) 107, 119, 26 Am. Dec. 645, 653, in which the opinion was written by one of this country's great judges, Chief Justice Lemuel Shaw. By the terms of the will the testator directed the executor to deliver the residue of the estate to three named ministers, " 'for the benefit and promotion of true evangelical piety and religion * * * placing full confidence in their piety, judgment and integrity, immediately to be by them sacredly appropriated to the cause of religion as above stated, to be distributed in such divisions and

to such societies and religious charitable purposes, as they may think fit and proper.' ". It was contended that the estate descended as intestate property because of the uncertainty of the paragraph noted above. In holding to the contrary the court said:

"* * * we think this trust to a charitable use, though to a great degree vague and indefinite, may be supported. The property is well given to the legatees, the trust is plain and manifest. Confidence is reposed in their piety, judgment, and integrity, to appropriate the property immediately to promote the cause of religion, by distributing it in such divisions, and to such societies and religious charitable purposes, as they may think fit.

"In all cases of charitable uses, or nearly all, the persons ultimately to be benefited by the donations are uncertain. The heathen of foreign lands, in the case of Bartlet v. King [12 Mass. 537, 7 Am. Dec. 99], were the ultimate objects of the donor's bounty; but of what foreign country, when, how, and to what amount, with all the particular details, were left uncertain, in all other respects than this, that the testator reposed confidence in the trustees, a confidence earned by their known character for fidelity and judgment, that they would appropriate the money in such manner as to accomplish his intentions. This was held sufficient to obviate the objection of vagueness and uncertainty.

"We are of opinion that the present case falls within the same principle; the donees are particularly designated, the trust is clear, the general objects sufficiently indicated to bind the consciences of the trustees, and to render them liable in equity to account for the execution of this trust * * *; and that these objects are sufficiently certain and definite, to be carried into effect, according to the established principles of law and equity, governing donations to charitable uses."

The authority of this decision has been recognized and followed.

V. The first question to answer in the determination of this appeal is whether Item 6 establishes a trust for a

charitable use or purpose. If it does then the other questions presented in the appeal must be answered. If such a trust is not created then the decree must be affirmed. The words of Item 6 directly bearing on this question are: " 'I direct. that my said trustees * * * shall distribute annually or semi-annually as they may see fit, the income thereof [the residue of his estate] to such persons and for such purposes *as they may feel* is directed by God the Father, Jesus Christ the Son and Holy Spirit, and *as they believe* would be acceptable to me and meet my approval were I able to give it * * *. By way of explanation *it is my desire* that any disbursements made under this paragraph shall be made to persons who believe in the fundamental principles of the Christian Religion and in the Bible and who are endeavoring to promulgate the same.' " (Italics ours.)

We must interpret and construe these words and sentences in accord with the principles of law and the decisions of the courts as hereinbefore noted, and in the light of the character and life of the testator, to ascertain his intention and to make it effective, if that be lawful and reasonably possible. He had lived the life of a devout and sincere Christian. He had upheld his church by his prayers, his presence, his gifts and his services. He had contributed of his time, effort and money to other activities of his church and in the promulgation of the funda- mental principles of the Christian religion. His way of life indicated what "he felt" and "believed", and throws a clear light upon his intent and purpose as expressed in Item 6. He wished that the religious activities of his own life be carried on after his death, so far as possible, through named trustees and their successors. He reverently believed that the Triune God directed and governed in worldly affairs—a belief that has prevailed with countless millions since the beginning of the Christian era. With respect to this belief a witness quoted words of Benjamin Franklin, to wit, "I have lived, sir, a long time, and the longer I live, the more convincing proofs I see of this truth that God governs in the affairs of men." The witness also quoted what George Washington wrote to Governor Trumbull of Connecticut, namely, "I can almost trace the finger of Divine Providence through those dark and mysterious days

that first led the colonists to assemble in convention, thereby laying the foundation for peace and prosperity when we had much reason to fear that misery and confusion were coming too rapidly upon us."

Doctor Small named as trustees Christian men, who were his intimate friends and knew of his way of life. He intrusted them with a broad discretion in the distribution of the income from the trust estate. They were not to await a sign or a direction from God the Father, Jesus Christ the Son or the Holy Spirit, before acting, but they were to distribute the income to such persons and for such purposes "as they may feel" would be in accord with the direction or will of the Trinity or Triune God, or, as often expressed, pleasing to God, as we will hereinafter refer to the Supreme Being. The testator placed but two limitations upon the discretion of the trustees in the selection of the purposes and persons, which they felt should participate in his bounty. One was that the selections be such as they "believed" would be acceptable to and approved by him were he living.

The other limitation was that those receiving his bounty should be such persons as the trustees felt were believers in the fundamental principles of the Christian religion, and in the Bible, and were endeavoring to promulgate the same. Subject to these limitations or restrictions the testator empowered the trustees to select, as they felt was in accord with God's will, both the purposes of the periodic distribution of the income of the trust estate, and the persons to whom distributions were to be made.

It is clearly evident that it was the intention of Doctor Small to make a testamentary gift or bequest of the income of the residue of his estate for the benefit of the public, in general, by the advancement, dissemination of, and interest in, the fundamental principles of the Christian religion and in the principles of the Bible, through the medium of that class or body of persons who were believers in and promulgators of those principles. Certainly it must be said that to aid the cause of Christianity and to intensify and extend interest in the Scriptures in the manner made effective by the testator's bequest was a purpose

in the aid of religion, and in the highest sense a gift for a public charitable use.

The mere fact that distribution of the income is made to individual members of a definite and designated class who believe in and are sincerely endeavoring to promulgate the specified principles is, in itself, a public benefit and an aid to religion, since it increases the income of said individuals and adds to their power and means to more effectively promulgate the principles. A distribution from the trust income to ministers of the Methodist Church or to the ministers of any other church denomination of the Christian faith—men who believe in fundamental principles of the Christian religion, and in the Bible, and whose daily occupation and profession is to promulgate those principles—would certainly be a religious charitable use and purpose beneficial to the public in general, as would a distribution to either home or foreign missionaries, or to the evangelists of those churches, or to believers in the Christian religion and the Scriptures, who are engaged in disseminating the principles of the first and the lessons of the second by the distribution of Bibles or literature, or in other ways. Financial aid to those doing such work, in itself, constitutes a religious charitable use or purpose to the betterment of a large and indefinite number of people. Furthermore, the trustees in the distribution of the testator's bounty to such persons may, in the administration of the trust, designate to and require of these beneficiaries the particular way or manner in which it shall be used in the promulgation of those principles. The ways and methods of such promulgation are beyond number. Distributions by the trustees to ministers to aid them in preaching the Gospel or in the performance of their religious duties would be for a valid charitable purpose. 14 C. J. S., Charities, section 18, page 451.

The effective functioning of the charitable use of the trust income, as provided in Item 6, does not require omniscience on the part of the trustees or of anyone else. The trustees are not required or supposed to have definite and actual knowledge of God's will or direction with respect to their selection of purposes or beneficiaries. They may by prayer or other effort seek Divine guidance in these matters, but they are bound only to

sincerely and conscientiously feel, think or believe that their choices are in harmony with the will of God. They may mistakenly believe they had such Divine direction in making a selection, but that does not destroy the trust. The testator did not expect perfection on their part, but nevertheless he chose them as his representatives to make effective his testamentary intention to the best of their abilities.

 Likewise the trustees are not, and will not, be required to have absolute and positive knowledge that the beneficiaries they choose are actually and in fact persons who believe in the fundamental principles of the Christian religion, and in the Bible, and are actually and in fact endeavoring to promulgate those principles. They are not required to be omniscient or to be able to correctly know the minds or innermost thoughts of the beneficiaries whom they choose, with respect to their said beliefs or endeavors. They are required only to earnestly, diligently and intelligently seek to ascertain, and to believe in good faith that the beneficiaries chosen believe in and are endeavoring to promulgate those principles.

Furthermore, the trustees are required only to believe that the choices of persons and purposes which they feel are in accord with God's will or direction would be acceptable to and approved by the testator were he able to so indicate. No other burden or duty is placed upon them. This requirement presents no problem. Assuredly, if the trustees rightly felt that their choices were pleasing in the sight of God, they would be acceptable to and approved by so good a Christian, as the testator had been. The testator knew when he named the trustees in his will that they had personal knowledge, in general, of his activities in behalf of the Methodist Church, the Y.M.C.A., Cornell College, the Moody Bible Institute, the American Bible Society, the Missions, and of his other religious endeavors, and of his financial contributions to them. He knew that if they had no particular or definite knowledge of these matters they could readily acquire it. He realized, no doubt, that the trustees whom he named, in performing their duties as trustees, would probably be influenced by their knowledge of what he had done, and would seek to do what they felt would have been approved by him. In fact these

trustees and their future successors for all time could properly perform all their duties and functions as provided by Item 6 by following in the testator's footsteps and in doing as he had done in his church and religious activities, as nearly as reasonably possible. But he knew, of course, that trustees of the distant future would have no personal or direct knowledge of his way of life with respect to the Christian religion or what would have been approved by him in their functioning as trustees; and he did not intend that they should so perform their duties as to merit his personal approval were he living, but that they should take as their pattern and exemplar and as one whose approbation they would seek, a true Christian person, such as he had always striven to be. It was not himself that he intended the future trustees to accept as the type of person their conduct as trustees would be acceptable to, but it was the example and ideal of a good and true Christian person who would be contemporaneous with them as they succeeded one another for all time to come.

Item 6 does not embrace or require anything that is unreasonable or impossible or unascertainable now nor in the future. It requires no infinity of knowledge by any trustee or court. The task of either is, or will be, no greater or more burdensome than has been the task for almost 2000 years, and is now, and will be in the future, of every sincerely true Christian who has tried, and is trying, to live a life and to conduct himself in a way pleasing to God, and whose prayers for guidance have been and will be—as that of Jesus at Gethsemane—"Not My will but Thine be done."

We have no doubt that the trust provided for in Item 6 is a public charitable trust, and being such it does not violate the rule against perpetuities, nor section 558.68 of the 1950 Code of Iowa.

VI. There is no uncertainty, indefiniteness or doubt about the purpose of the charitable trust provided for in Item 6, as it is confirmed and clarified in the explanatory last paragraph of the item, in which he expressed his "desire", which was in fact a direction. Its purpose was to promote and promulgate until time is no more the religion founded by Jesus Christ and the

fundamental principles and teachings thereof, and of the Bible, through persons and purposes and ways "felt" and deemed by the trustees to be in accord with the will of God the Father, Jesus Christ the Son, and the Holy Spirit, and as the testator would have accepted and approved of in life.

VII. There is no uncertainty, indefiniteness or doubt as to the general class or body of persons through whom the charitable use or purpose is to be made effective through the testamentary gift of the testator. That class embraces all persons who believe in the fundamental principles of the Christian religion, and in the Bible, and who are endeavoring to promulgate the same. The testator removed any uncertainty as to the individuals of this class or body by designating trustees and granting them the authority and discretion to select those to whom distribution of the income of the trust property should be made, and the times and purposes of the distribution, subject to such limitations as have hereinbefore been noted.

VIII. We find no basis for the various allegations of "incapability of enforceability" and "impossibility of ascertainment", as alleged in the lettered subdivisions of paragraph 7 of the petitioners' application. This court in several cases has passed upon like questions in several appeals involving charitable uses, several of which we have referred to. Other pertinent decisions of this court are: Quinn v. Shields, 62 Iowa 129, 140–144, 17 N.W. 437, 49 Am. Rep. 141, in which the residuary estate was given to a trustee for " 'the support and encouragement of such worthy and meritorious charitable and educational and religious institutions of the Roman Catholic faith, as my said friend, Mary T. Shields, may determine.' " This court said (page 141) : "The beneficiaries of the charity * * * are here clearly indicated to be 'such worthy and meritorious' institutions of the 'Roman Catholic faith', as may be determined by Mary T. Shields. The will docs not specifically name the persons or institutions that are to receive the charity. It leaves the beneficiaries to be chosen and named by the person appointed to distribute the charity. It is competent for a testator to bestow a charity upon a person or institution to be chosen or named by a trustee or executor." In Grant v. Saunders, 121 Iowa 80, 81, 95 N.W. 411, 100 Am.

St. Rep. 310, a bequest was upheld against a contention of vagueness and uncertainty, which gave to a trustee the residue of the estate " 'for the benefit of the poor, and to be given by her to such objects, as in her judgment are worthy of assistance, from time to time, and at such times and persons as she thinks best to help.' " In Martinson v. Jacobson, 200 Iowa 1054, 205 N.W. 849, 850, a testamentary gift was made to the directors of a corporation of Stockholm, Sweden, to be used by them " 'for furtherance, promotion and extension of their foreign mission work.' " The petition of the heirs-at-law of the testator to declare this clause of the will void was dismissed. The opinion reviews a number of our decisions.

The latest decision of the court bearing upon the issues involved herein is Gray v. Watters, 243 Iowa 430, 433, 51 N.W.2d 885, 887, 888, in which case an elderly maiden lady, before dying intestate, gave her close friend, Mrs. Watters, the key to her bank safe-deposit box and directed her to take two certificates therefrom and to distribute the proceeds thereof " 'in the way you think I would want it done for religious purposes.' " The administrator of the intestate was declared the owner of the certificates by the trial court. This court reversed and held that the deceased had made a completed oral gift of the certificates to the defendant in trust for religious and charitable purposes, and reaffirmed its prior decisions that a charitable gift for a religious purpose was one "toward which equity adopts a liberal attitude."

IX. We have already discussed the allegations of the application and the contention of the applicants that it would be impossible for the trustees or the courts to determine what persons believe in or are endeavoring to promulgate the fundamental principles of the Christian religion, and of the Bible, "because of the lack of widespread common agreement as to what constitute such fundamental principles." It is our abiding conviction that this contention is without merit and is contrary to the preponderant weight of the evidence.

X. The petitioners (appellees) contend that no court could supervise the administration of the trust provided for in Item 6. The contention is not sound. It is true that such trusts

are subject to the supervision of courts of equity, but there are limitations on such supervision. Generally speaking, courts will not interfere with a discretion lodged in a trustee, in the absence of a showing that he is neglecting his duties, abusing his power or otherwise acting in an improper or unlawful manner. As said in In re Trusteeship of Clark, 174 Iowa 449, 455, 154 N.W. 759, 760, 156 N.W. 353: "* * * while the court may control the administration of a trust created by will, it may do so only in a proper case; that, while it may not do so *upon a mere difference of judgment between the court and the trustees*, it may intervene * * * for· its preservation, and to shield it from spoliation or gross mismanagement." (Italics ours.) In Arnette v. Watson, 203 Iowa 552, 554, 213 N.W. 270, 271, we said: "The discretionary power lodged in the trustee under the broad terms of this will is one which will not be controlled by a court, in the absence of fraud or of evidence of abuse of such power. Dickey v. Barnstable, 122 Iowa 572 [98 N.W. 368]."

The court may not arbitrarily interfere, or control the discretion of the trustee granted him by the settlor, in the manner in which he shall discharge his duties. See also In re Estate of Tone, 240 Iowa 1315, 1321, 1322, 39 N.W.2d 401, and authorities cited; Johnson v. Johnson, 242 Iowa 27, 29, 45 N.W.2d 573; Restatement, Trusts, section 187; Geisinger v. Geisinger, 241 Iowa 283, 289, 290, 41 N.W.2d 86. As said therein in language pertinent to this case, the court will not assume the trustee will abuse the discretion conferred, as to do so would supersede and control the exercise of discretion granted him by the testator.

XI. The cardinal rule in the construction of a testamentary provision is the ascertainment of the testator's intention. And as stated in In re Estate of White, 209 Iowa 1210, 1212, 229 N.W. 705, 706: "* * * by this is meant the actual, personal, individual intention, and not a mere presumptive intention, inferred from the use of a set phrase or a particular form of words." We have so held so many times that a repetition of cited cases is unnecessary.

There can be no doubt that it was the intention of Doctor Small to establish a public charitable trust in the cause of and for the furtherance of the Christian religion. And it

cannot be said that Item 6 is so "absolutely dark" (In re Estate of Johnston, supra, 141 Iowa 109, 111) and "so absolutely clouded" (In re Estate of Durham, supra, 203 Iowa 497, 502) that the testator's meaning, intention and purpose cannot be ascertained.

It is our conclusion that the finding, judgment and decree of the district court is erroneous and that it should be and it is reversed and the cause is remanded to said court for entry of judgment and decree sustaining and establishing the said Last Will and Testament of W. B. Small in each and all of its parts, in accord with this opinion.—Reversed and remanded with directions.

OLIVER, GARFIELD, WENNERSTRUM, MULRONEY, THOMPSON, and LARSON, JJ., concur.

SMITH, C. J., and HAYS, J., dissent.

SMITH, C. J. (dissenting)—The general principles laid down by the majority are unquestioned: A trust to foster religion and to aid in the propagation of its doctrines is of course charitable; a charitable trust is not within the rule against perpetuities; charitable trusts are highly favored and instruments creating them should be liberally construed and given effect if consistent with law; and certainty as to details of execution will not be required as in the case of noncharitable or private trusts.

These propositions need no laboring. But their mere statement does not solve our problem here. Before they become applicable or pertinent there must be shown a *purpose* recognized in law as charitable. The gift must be one " 'to be applied * * * for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government.' " Heald v. Johnson, 204 Iowa 1067, 1070, 216 N.W. 772, 773, citing Union Pacific R. Co. v. Artist, 9 C.C.A. 14, 60 F. 365, 23 L. R. A. 581, which, in turn, quotes from Jackson v. Phillips, 14 Allen (Mass.) 539,

556. See also 14 C. J. S., Charities, section 1, and Restatement, Law of Charitable Trusts, section 368, which lists practically the same purposes to be considered as charitable.

I. I submit Doctor Small's will fails to state any purpose or use coming within this comprehensive enumeration: *"I direct that my said trustees or their successors shall distribute * * * the income thereof * * * for such purposes as they may feel is directed by God the Father, Jesus Christ the Son and Holy Spirit, and as they believe would be acceptable to me and meet my approval * * *."*

This is all that is said as to the *purpose* that we are asked to say is charitable. In a succeeding paragraph the will states: "By way of explanation it is my desire that any disbursements made * * * shall be made to *persons* [emphasis supplied] who believe in the fundamental principles of the Christian Religion and in the Bible and who are endeavoring to promulgate the same."

The majority opinion is written on the theory that the purpose of the proposed trust is to *propagate* the Christian faith, but nowhere does the will so state. The "persons" designated need only be Christians. They need not be ministers, missionaries, preachers or teachers, nor need they be engaged in the advancement of Christian principles or the carrying on of any charitable or religious work. They are required only to "believe" and endeavor to "promulgate" Christian principles; that is, "to make known by open declaration, as a law, decree, or esp., a dogma." Webster's International Dictionary. They are not required to be needy persons, nor wanting in education, nor sick, nor underprivileged in any way. The most that can be said from the language of the "explanation" is that disbursements must be made to *Christians*. The purpose is nowhere indicated to foster any religious institutions or to aid in the propagation of any religious doctrines.

II. The majority opinion in Division IV states "it is necessary, only, that there be definiteness and certainty as to the particular class or group which is to partake of the charity, and not to the individuals thereof."

What definiteness in that respect is found here? What group or class is indicated except *all* who believe in and endeavor to practice the principles of Christianity?

There is no church or particular set of believers designated by reason of locality or otherwise. The class is worldwide and regardless of any limitations of sect or particularity of practice.

This court has held too indefinite a gift " 'to be divided among the Sisters of Charity' ", saying: "If the bequest should be sustained, how would the trustees execute it? No one would say that it should be divided among all of them, for such, in reason, could not have been the intention. There is no limitation as to locality, state or nation." Moran v. Moran, 104 Iowa 216, 224, 225, 73 N.W. 617, 620, 39 L. R. A. 204, 65 Am. St. Rep. 443.

The majority opinion, in this situation, falls back upon the rule that uncertainties as to beneficiaries do not render the gift void "where the trustee or some other person is empowered to select the beneficiaries," quoting 14 C. J. S., Charities, section 40 (page 477).

Doctor Small's will designates four named "friends" to act as trustees and provides that any vacancy occurring "either by death or incapacity to act * * * shall be filled by appointment by the remaining trustees" with court approval. (Two predeceased the testator and no successors have been appointed.)

It authorizes them "to choose and change the beneficiaries as said trustees may from time to time *unanimously* decide" (emphasis supplied) and adds: *"It being my desire, intention and direction that said fund shall continue permanently and forever, and only the income thereof shall be used for the disbursements herein contemplated,* and nothing herein shall prevent said trustees from allowing said income to accumulate in the event they do not find a suitable beneficiary as herein stated." (Emphasis supplied.)

I cannot believe the rule sanctioning the delegation to trustees of the power of selecting beneficiaries should apply here. It has been said:

"The reason a trustee is allowed to enforce a trust, the object of which is expressed only in general terms, is that in

exercising his discretion he carries out the intention of the testator. But when there is no trustee appointed to exercise this discretion in devising a scheme for the execution of the trust, the court of equity can look alone to the will, and, if it does not show the intention of the testator, parol testimony is inadmissible, and the trust must fail." (Citing authorities.) City of Haskell v. Ferguson, Tex. Civ. App., 1933, 66 S.W.2d 491, 495.

And the Ohio Supreme Court has held that where property is devised in trust for such charitable purposes as the trustee may deem proper the testator makes the judgment and discretion of the named trustee essential to the creation of the trust notwithstanding a statute that in effect provides against the failure of a testamentary trust by reason of the death, incapacity or refusal to act of the named trustee. Rogers v. Rea, 98 Ohio St. 315, 319, 120 N.E. 828.

The court in that case, in holding the trust unenforceable, refers to it as a "personal trust" and points out that the will "is silent as to how it shall be executed save and except that it be according to the judgment of" the named trustee, who apparently predeceased the testatrix.

Here, trustees are named who presumably knew Doctor Small's wishes and to whose discretion he was willing to commit the selection of purposes and beneficiaries. We are asked not merely to hold this sufficient for the immediate present but to confide to future trustees selected by future trustees in succession, "permanently and forever," the selection of such beneficiaries and the determination of such purposes to be served "as they [trustees] may feel is directed by God * * * and as they believe would be acceptable to" Doctor Small.

I cannot consent to the imposition of this burden upon the court for all time to come. Conceding, for argument's sake, that trustees named by the testator and empowered by him to select the particular purpose and beneficiaries of his bounty might be depended on to administer the trust, how can the court intelligently supervise its administration when their personal knowledge of testator's wishes is not longer available? The question answers itself.

We all, I am sure, have the highest respect for the elevated character of Doctor Small and his aspirations as revealed by the terms of his will. It may be regretted that he did not define his wishes in such way that his bounty could be judicially administered and bestowed. But our duty to observe equitable rules and procedures should be superior even to the desirability of upholding a charity so vaguely outlined here.

I would affirm the decision of the trial court.

HAYS, J., joins in this dissent.