In re Last Will and Testament of Carl R. Faber.

No. 51994.

April 5, 1966.

Rehearing Denied June 13, 1966.

Fulton, Frerichs & Nutting, of Waterloo, for appellant, Earl Faber.

Payer & Vanderbur, of Ames, for appellee, Friedl Kirschnich.

Gerald O. Blake, of Jewell, for executor.

Snell, J.—This appeal involves the construction of a will. The case arose in probate but was tried as a proceeding in equity pursuant to section 33, Iowa Probate Code, chapter 326, Laws of the Sixtieth General Assembly. Our review is de novo. Although not bound thereby we give weight to the findings of the trial court. Rule 344(f)7, Rules of Civil Procedure.

The question is whether the residuary bequest of testator constituted a gift accompanied by mere precatory words or an enforceable trust and as such in excess of limits provided by our mortmain statute, section 266, Iowa Probate Code.

As provided in section 3, Iowa Probate Code, we use the word "bequest" to include the word "devise."

Carl R. Faber of Jewell, Hamilton County, Iowa, died testate. His will dated June 6, 1959, and the codicil thereto

dated December 12, 1964, have been admitted to probate. His estate is in process of probate.

The will directed the payment of debts, expenses of last illness and burial and costs of administration. It next directed payment of all estate, inheritance, succession, transfer and other taxes by the executor from funds in the general estate.

The will then gave to testator's son (the son was adopted but not referred to as such) Earl Faber, $7000, to Rosa Kirschnick, a granddaughter, $1000, to Friedl Kirschnick, an adopted daughter, $100, to a half sister in Germany, $500, and to a nephew in Germany, $1000. The will next made six specific bequests totaling $4100 to named religious and charitable organizations.

Paragraph number "Fourth" provided:

"All the rest, residue and remainder of my estate be the same real, personal or mixed and wherever situated, not hereinbefore disposed of, I give, devise and bequeath unto my son Earl Faber, to be distributed by him in such sums and to such Christian organizations as he may find and believe to be worthy in their work of advancing the cause of Christianity. And I further authorize and direct my executor hereinafter named, to sell and dispose of any or all of my property, at such time or times as may appear most advantageous to my estate, and he may do so without obtaining any order of court for such sale."

Paragraph number "Fifth" appointed testator's son Earl Faber as executor. The nominated executor was not relieved from giving bond.

The codicil added two specific bequests as follows:

"I give, devise and bequeath unto Deborah Faber and David Faber being my grandchildren and the children of Earl Faber the sum of $1000 each to be used for the furtherance of their college educations."

Testator was a widower. He was survived by an adopted son, Earl Faber, and an adopted daughter, Friedl Kirschnick.

Testator's estate was in excess of $75,000.

We adopt the following excerpts from the trial court's Findings of Fact:

"The battle here rages over the fourth paragraph of the decedent's last will and testament. * * *

"In order to construe this Will and this paragraph it is necessary to know something about the decedent's life. He was a resident of Hamilton County and he died on June 5, 1964. His will was admitted to probate on July 11, 1964. In his will he nominated his adopted son Earl Faber of Momence, Illinois, as executor. Being a nonresident of [Iowa] the District Court of Hamilton County appointed Stewart Lund, an attorney, to be the resident executor or perhaps more correctly stated administrator with the will annexed. According to the inventory on file the estate will have a value in excess of $75,000.

"Earl Faber, the son, was adopted by the decedent when he was about 5 years of age. He is now about 43. Earl helped his father on the farm and later assisted him in a meat lock plant which was located in Jewell, Iowa. Earl went into the service in World War II and upon his return continued to assist in the business. Apparently Earl and his father got along very well. In 1951 Earl married and moved to Illinois. He would return to visit his father at least once or twice a year.

"Friedl Faber Kirschnich was born and brought up in Germany. She was a niece of decedent. Friedl's first husband was declared to be missing in action in World War II. Friedl then married a man by the name of Kirschnich. The decedent decided to adopt Friedl sometime during the year 1946. Stewart Lund and his father handled the legal work. The record is not clear whether the motivation to adopt Friedl was due to affection for her or whether it was to facilitate her entry into the United States. The testimony justified the latter view.

"The decedent was a very religious man. Mr. Blake, the scrivener, who prepared the will stated that he was almost a 'religious fanatic.' In any event he donated the land upon which a Lutheran Church was constructed in Jewell. He made substantial gifts to it. His pastor stated that religion was his life's work. He was an avid reader of the Bible. He served on the Board of Trustees of his church. He was generous not only to his church but to other charitable projects. He was a student of the Bible and would quote passages verbatim. It was not unusual for him to attend three services on Sunday. He was kind and made gifts to the Lutheran Synod and to the missions.

"In his will and codicil he left about $11,000 to his family

and relatives and about $4000 to certain religious organizations. It was agreed by all parties to this action that if a trust was established under Paragraph 4 of the will that the limitation as provided by * * * the Code would govern. * * *."

The record shows that Friedl lived in decedent's household for about ten months after coming here from Germany. She then left and moved away with her husband who had arrived from Germany. The record fails to show any contact or communication between testator and the Kirschnichs after November 6, 1952. There is some slight indication in the record of ill feeling over who should pay the expenses incident to Friedl's adoption and entry into this country.

Decedent's bequest to be distributed for the advancement of the cause of Christianity was not the result of any sudden impulse. Wills had previously been prepared for him. In October 1949 decedent had prepared but never executed a will providing after specific bequests:

"All the rest and residue of my estate, of every kind and description, both real, personal and mixed, not herein disposed of, I give, devise and bequeath unto the Rev. Clarence Erickson of the Gospel Tabernacle, Chicago, Illinois, for mission and gospel work. The Reve. Erickson to have the sole discretion and direction of the disposition of this bequest without any accounting of any kind or nature."

Decedent's attorney who prepared the unexecuted "will" testified that one of the problems he had to explain to decedent was that Reverend Erickson "did not have to do exactly what it said" in the will. He also testified that decedent knew that the bequest was an outright gift. Decedent was apparently not satisfied because he never executed the proposal as his will. It should be noted that the provisions in the will involved herein are not the same as the former proposed will and there is no such a specific relief from any accounting.

The scrivener who prepared the will involved herein was not the same attorney who prepared the former proposed will. He had no discussion with testator about trusts as such. He testified that it was his opinion based on conversations and directions of decedent that decedent intended that the money should go to charities and not to Earl Faber. In response to a

question by the court he said Earl Faber was the conduit to get the funds to the Christian organizations.

The trial court concluded that Paragraph 4 of testator's will created a valid trust. We agree.

I. In will construction cases "It is well settled law (1) the testator's intent is the polestar and must prevail; (2) his intent must be gathered from a consideration of (a) all the language contained in the four corners of his will, (b) his scheme of distribution, (c) the circumstances surrounding him at the time he made his will, and (d) the existing facts; and (3) technical rules or canons of construction should be resorted to only if the language of the will is ambiguous or conflicting or the testator's intent is for any reason uncertain." In re Estate of Larson, 256 Iowa 1392, 1395, and cases cited therein, 131 N.W.2d 503.

II. We think the language used by the testator is of controlling significance in determining the intent of the testator.

In the paragraph numbered "Third" the testator made an outright bequest to Earl but in paragraph numbered "Fourth" the bequest was to Earl Faber "to be distributed by him in such sums and to such Christian organizations as he may find and believe to be worthy in their work of advancing the cause of Christianity." In this paragraph there is not a word to indicate that Earl was to personally benefit or participate with distributees of the fund.

The fund was to be distributed. To distribute according to Webster's Third New International Dictionary, unabridged, means to divide among several or many; deal out or apportion. See also 27 C. J. S., Distribute and Distributed, pages 614 and 615. Webster's definition is quoted with approval in Des Moines Joint Stock Land Bank v. Nordholm, 217 Iowa 1319, 1331, 253 N.W. 701.

The fund was to be distributed to Christian organizations. Earl described himself as a Christian but he was not an organization.

The words used in the will viewed in the light of testator's habits, customs and interests clearly indicate an intent that his bequest was for the advancement of the Christian religion.

III. In 1 Scott, Law of Trusts (1956) section 25.2, page 193, it is said:

"The modern view. Under the older view the question was whether the testator desired that the legatee should make a particular disposition of the property. If he did and if that disposition was one which could be enforced, the courts held that a trust was created. Under the modern cases the question is: Did the testator not only desire that the legatee should make a particular disposition of the property, but did he intend to impose a legal obligation upon him to make the disposition? Under the earlier rule it was easier to determine whether or not a trust was created than it is under the modern view, which makes the question one of interpretation of each particular will. But where the question is one of ascertaining the intention of the testator, any hard and fast rule is inappropriate. This change of view is in accordance with the general trend of modern law in favor of doing away with artificial rules as to the presumption of intention, and in favor of recognizing that a will should be construed in accordance with the language used in each particular case as interpreted in the light of all the circumstances."

In 4 Scott, Law of Trusts (1956) section 351, page 2574, it is said:

"A charitable trust, like an express private trust, is created only if the settlor properly manifests an intention to create it."

Particular language is not required.

"Where the settlor uses language expressive of a desire rather than of a command, precatory rather than mandatory language, it is a question of interpretation whether his intention is to leave the donee or legatee free to decline to carry out the designated charitable purpose, or to impose a binding obligation upon him to devote the property to the designated purpose."

In 1 Restatement of the Law, Trusts, Second Ed., section 25, Comment b, page 69, it is said:

"b. Precatory Words. On the one hand, the settlor may manifest an intention to create a trust; on the other hand, his manifestation of intention may amount merely to a suggestion or wish that the transferee should use or dispose of the property in a certain manner, leaving it to the transferee to follow the suggestion or comply with the wish only if the transferee desires

to do so. No trust is created if the settlor manifests an intention to impose merely a moral obligation. In determining the intention of the settlor the following circumstances among others are considered: (1) the imperative or precatory character of the words used; (2) the definiteness or indefiniteness of the property; (3) the definiteness or indefiniteness of the beneficiaries or of the extent of their interests; (4) the relations between the parties; (5) the financial situation of the parties; (6) the motives which may reasonably be supposed to have influenced the settlor in making the disposition; (7) whether the result reached by construing the transaction as a trust or not a trust would be such as a person in the situation of the settlor would naturally desire to produce."

IV. The trial court cited and relied on Minot v. Baker, 147 Mass. 348, 349, 17 N.E. 839, 845, 9 Am. St. Rep. 713, 714, as a landmark case. We agree with the trial court. This was an 1888 Massachusetts case with the opinion written by Justice Holmes. The testator's will gave the residue of the estate to one Healy "to be disposed of by him for such charitable purposes as he shall think proper." Healy died having disposed of only part of the residuary estate in his hands for charitable purposes. The question was whether the money should be paid to the next of kin of the testator or be applied to charitable purposes according to a scheme under the direction of the court. The court said:

"It is settled that the gift to Healy was a good charitable trust [citations]. There was no resulting trust on account of the vagueness of the objects, as there is in cases where the objects are not confined to charities. [Citation] The first point to be determined, therefore, is a matter of construction, whether the limitation to charities was conditional upon Healy's making an appointment, or whether it should be construed as a gift to charitable uses out and out, with a superadded power to Healy to specify them if he saw fit. And on this part of the question we are of opinion that the gift is an unconditional gift to charitable purposes."

A landmark case in Iowa is In re Estate of Small, 244 Iowa 1209, 58 N.W.2d 477, wherein JUSTICE BLISS exhaustively re-

viewed problems and authorities incident to charitable trusts. We quote therefrom:

"In section 56, page 625, of 10 Am. Jur., Charities, speaking of particular religious purposes, it is stated: 'It also includes all devises or bequests intended to foster religious institutions and to aid in the propagation of religious doctrines. Of such a character is a devise or bequest for the advancement of the Christian religion. [Citations] A devise or bequest to aid in the dissemination of the Gospel at home or abroad, when the object is to be accomplished by the support of missions, a bequest to aid in the distribution of Bibles and other religious literature, and devises and bequests for the support of the ministry are recognized as gifts for charitable uses.' See also 14 C. J. S., Charities, section 42(d), page 490 et seq. * * *

"In re Estate of Durbrow, 245 N. Y. 469, 473 to 476, 157 N.E. 747, 748, 749, the will of the testatrix provided: 'I direct my executor or executrix * * * to distribute where he, or she as his successor or substitute, in his or her judgment shall consider it will be most effective in the advancement of Christ's Kingdom on earth.' The devise was of the residue of her estate. Her next of kin contested the validity of the bequest as void for indefiniteness and uncertainty of purpose." (Loc. cit. 1222 and 1223)

The devise was upheld.

" 'Such bequests should not be read in an antagonistic spirit to disappoint the general intention of the will. As Gray, J., said in Greene v. Greene, 125 N. Y. 506, 512 [26 N.E. 739, 741, 21 Am. St. Rep. 743]: "The endeavor is to find a way of upholding the will, not of breaking it down; and thus, in every case the inherent purpose, if lawful, should be effectuated through what legal channels * * * may be open." ' " (Loc. cit. 1223 and 1224)

"It is a well-recognized rule, uniformly followed by all courts, that gifts to charitable uses and purposes are highly favored in law, and will be most liberally construed to make effectual the intended purpose of the donor. This court has always been zealous in protecting the rights of beneficiaries of charitable trusts. As said by Justice Ladd in In re Estate of Johnston, 141 Iowa 109, 111, 119 N.W. 275: 'Charitable gifts

are strongly favored. The courts will carry them into effect if this can be done consistently with established rules of law. Indeed it is said that courts never construe a charitable bequest void unless it is so absolutely dark that they cannot find out the testator's meaning.' " (Loc. cit. 1225)

" 'Charitable gifts are strongly favored by courts. * * * It is well established, even where no charitable bequest is involved, that if any testamentary provision is open to two constructions, one of which would render it void or inoperative, and another which would render it valid, the latter is always to be taken and the former rejected. * * * This rule is particularly applicable where a charitable bequest is drawn in question. An analogous rule is also frequently applied to bequests to charity. If there are two meanings of a word, one of which will effectuate and the other defeat the testator's object, the court will select the former meaning.' " (Loc. cit. 1226) Quoting Jensen v. Nelson, 236 Iowa 569, 571, 19 N.W.2d 596, 598.

What was said of the testator in the Small case is equally applicable to the testator in the case before us.

"We must interpret and construe these words and sentences in accord with the principles of law and the decisions of the courts as hereinbefore noted, and in the light of the character and life of the testator, to ascertain his intention and to make it effective, if that be lawful and reasonably possible. He had lived the life of a devout and sincere Christian. He had upheld his church by his prayers, his presence, his gifts and his services. He had contributed of his time, effort and money to other activities of his church and in the promulgation of the fundamental principles of the Christian religion. His way of life indicated what 'he felt' and 'believed', and throws a clear light upon his intent and purpose * * *." (Loc. cit. 1232 of 244 Iowa)

In Eckles v. Lounsberry, 253 Iowa 172, 177, 111 N.W.2d 638, we said: "Charitable gifts are strongly favored by the courts and will be upheld wherever possible", and quoted with approval this statement of Lord Hardwicke: " 'There is no authority to construe it to be void, if by law it can possibly be made good.' "

See also Palmer v. Evans, 255 Iowa 1176, 124 N.W.2d 856.

V.  In the case of In re Estate of Small, supra, wide dis-

12

cretion in the selection of beneficiaries was vested in the trustees. We said:

■ "Charitable devises or bequests should be upheld when, construed in the light and spirit of the rules and decisions noted hereinabove, they are sufficiently definite with respect to their purposes and subject matter, and the classes to be benefited, to permit of enforcement by a court of equity." (Loc. cit. 1229)

The same is true in the case at bar.

VI. "Mortmain statutes are not new to the law. They have been enacted and enforced since the time of the Magna Charta. From jurisdiction to jurisdiction and from time to time the wording has varied, apparently having different specific limitations in mind, and resultantly with varying results." Palmer v. Evans, supra, loc. cit. 1182.

Our present statute appears in chapter 326, section 266, Iowa Probate Code.

Under this statute when a bequest such as was made by testator exceeds one fourth of the net estate a child, and others identified in the statute, may elect and claim the portion of the excess to which he would have been entitled had such excess been intestate property. Under this statute Friedl Kirschnich filed such election.

It is apparent that testator's charitable bequests exceed one fourth of his estate. The executor accordingly filed this action for will construction.

Subsequent to the filing of election by Friedl Kirschnich and prior to trial the court extended the time within which Earl Faber might file election for thirty days from and after the filing of the trial court's decision. Because of this appeal the decision has not yet become final. The time within which Earl Faber may elect should be extended.

VII. The authority of the Attorney General in charitable trusts now appears in section 21, chapter 432, Laws of the Sixty-first General Assembly, adding section 303 to the Iowa Probate Code. The trial court's provisions relative thereto were proper.

VIII. The trial court's judgment and decree was as follows:

"1. Paragraph Four of decedent's will created a valid and enforceable charitable trust.

"2. Said trust shall be registered with the Attorney Gen-

eral of the State of Iowa upon the completion of the business in the estate.

"3. After the payment of the specific legacies, court costs, claims, charges and costs of administration the balance remaining is to be divided into two shares with 25% going into the trust and the 75% remaining to be divided equally between Earl Faber and Friedl Kirschnich, who are the sole and only heirs of the testator.

"4. Earl Faber shall have a period of nine months from and after the date of the closing of the estate to nominate the Christian organizations that he feels should be entitled to the funds, failing which, such designation shall be made by the Attorney General of the State of Iowa, subject to court approval.

"5. It is further ordered that this court shall retain jurisdiction herein to execute this trust and until this can be accomplished the trust funds are to be deposited in a federally insured bank or savings and loan association in the State of Iowa.

"6. The costs of this proceeding are taxed to the estate and are to be paid in accordance with Paragraph 3 above."

The trial court's reference in paragraph 3 of the decree to specific legacies was beyond the provisions of the statute. The statute provides only for deduction of debts and charges in determining what is in excess of one fourth of the estate. The words "specific legacies" in the decree are deleted.

The paragraph also assumes that Earl Faber has or will file an election to participate in the computed excess. The record before us is silent in this particular

Earl Faber is given thirty days from and after the filing of procedendo herein to file such an election. In the absence of such election Earl Faber may take only the specific bequest provided for in Paragraph "Third" in the will. The absence of such an election would not augment the share of Friedl Kirschnich but would augment the trust fund.

If such election is filed Earl is entitled to his specific bequest plus one half of the excess but in no event in the aggregate more than he would have received had the decedent died intestate, i. e., one half of the estate. See section 266, Iowa Probate Code.

The limitation on charitable bequests is effective only

when imposed by persons adversely affected and only for the benefit of those persons imposing the limitation. The statute provides for ratable reduction of charitable bequests where limitation is imposed. See committee comment, Iowa State Bar Association Probate Practice Manual.

Except as modified herein the trial court is affirmed. Costs shall be taxed to the estate.—Modified and affirmed.

All JUSTICES concur.