# IN THE SUPREME COURT OF IOWA

No. 19–0155

Filed November 8, 2019

**IN THE MATTER OF THE APPLICATION OF COE COLLEGE FOR INTERPRETATION OF PURPORTED GIFT RESTRICTION,**

**COE COLLEGE,**

Appellant.

---

Appeal from the Iowa District Court for Linn County, Fae Hoover-Grinde, Judge.

A college appeals a district court judgment denying its request for declaratory relief as to the terms of a 1976 charitable gift. **AFFIRMED.**

Gary J. Streit, Megan R. Merritt, and Teresa K. Baumann of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, and Chantelle Smith, Assistant Attorney General, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

How permanent is a "permanent home"? This case concerns seven works painted by one of Iowa's best-known artists—Grant Wood. In 1976, a foundation donated the paintings to Coe College in Cedar Rapids. The gift letter stated that the paintings would be given to the college "and that this would be their permanent home, hanging on the walls of Stewart Memorial Library."

For years, the college treated the paintings on its books as an unrestricted gift that could be sold or otherwise alienated. But in 2016, an auditor determined the paintings should be treated as a restricted gift. This had an adverse impact on the college's endowment fund and led the college to file a petition seeking a judicial interpretation of the gift's terms. Following a hearing on a stipulated record, the district court ruled that there indeed exists a restriction on the alienability of the paintings. The court also ruled that neither Iowa Code section 540A.106, part of the Uniform Prudent Management of Institutional Funds Act (UPMIFA), nor the common law doctrine of *cy pres*, codified at Iowa Code section 633A.5102, applied; accordingly, the court declined to modify the restriction.

The college appeals. It argues that the 1976 gift was unrestricted, but if this court finds it to be restricted, we should modify or discard the restrictions. We conclude that the language in the gift letter did restrict the gift. We conclude that the UPMIFA does not apply because these are not "funds" but are instead "program-related assets." Lastly, we find it is premature to consider the application of *cy pres* because there is no showing the gift restrictions cannot be carried out at present.

## II.  Facts and Procedural History.

In 1932, hotel magnate Eugene C. Eppley commissioned renowned artist Grant Wood to paint a mural in the Hotel Montrose in Cedar Rapids. The mural became known as "The Fruits of Iowa."  When the Hotel Montrose was sold in 1957, some fifteen years after Wood's death, Eppley had the mural taken down and separated into seven separate panels.  He loaned the paintings to Coe College, a private liberal arts college in Cedar Rapids.  The loan was to last indefinitely, with the understanding that the paintings could be taken back at any time after one year passed.  The paintings remained on display at Coe College for nearly twenty years.

At some point in time, the ownership of the paintings moved from Eppley personally to the Eppley Foundation, a charitable institution whose purposes included to

> promote the well-being of mankind and to assist the needy and unfortunate, by religious, charitable, scientific, literary or educational activities; and for such purposes to make grants, donations, and contributions to corporations . . . organized and operated exclusively for religious, charitable, scientific, literary or educational purposes.

In 1976, while winding up its affairs, the Eppley Foundation terminated the previous loan arrangement and donated the paintings to Coe College.  The Eppley Foundation's gift letter stated,

> The Eppley Foundation Board of Directors [has] approved that the Grant Wood paintings be given to the Coe College and that this would be their permanent home, hanging on the walls of Stewart Memorial Library.

> A Plaque to be installed, per attached proposal, was discussed with you when you were here, with a piece of marble and attaching the bust and the letters to the marble, including the two bronze plaques which were outlined on the sketches.

> We are again enclosing a picture of how this plaque will look like when it is completed but it will be done in bronze instead of aluminum.

> Mr. Christian gave you the name of the Company in Omaha that made this plaque, The J. P. Cooke Co., 1311 Howard Street, Omaha, Nebraska, 68102.

> Before this plaque is installed, we want to approve the full[-]scale drawing. Please return the picture of the plaque and also the sketch which is attached when you are through with same.

The plaque states in relevant part, "In [Eppley's] memory, the Grant Wood Paintings the Fruits of Iowa were given to Coe College by the Eugene C. Eppley Foundation Inc." It includes a bust of Eppley and an inscription with the years he lived. It further states that Eppley's "great wealth" was "to be distributed for the benefit of youth and for the lasting good of mankind."

The paintings have remained under the ownership of Coe College since then and are among several Grant Wood pieces on display in the Perrine Gallery at Stewart Memorial Library. Coe College occasionally lends them to other institutions for temporary exhibition purposes and to raise funds for the maintenance of the paintings.

In 1977, the Eppley Foundation was dissolved by the Nebraska Secretary of State for nonpayment of biennial fees, and nothing has been filed since then to revive the Eppley Foundation.

From 1976 until 2016, Coe College accounted for the paintings as unrestricted assets. In 2016, however, as part of a routine annual audit, the college's auditors determined this previous classification had been a mistake and reclassified the paintings as permanently restricted net assets. This matters to Coe College because the classification of the paintings affects the value of Coe College's endowment fund. Coe College turned to the courts for assistance.

On February 5, 2018, Coe College filed a petition seeking an interpretation of the Eppley Foundation's gift as unrestricted. If

necessary, the petition also sought a lifting of any restrictions accompanying the gift. Coe College argued that the reference to a "permanent home" in the 1976 gift letter was meant to contrast with the prior situation where the paintings had been on loan and thus only on temporary display—and not to serve as a bar to the college selling or otherwise disposing of the paintings. Alternatively, Coe College asked the court to remove the restrictions.

Since the Eppley Foundation was no longer in existence, Coe College arranged for the attorney general to be served with the petition. Pursuant to Iowa Code sections 540A.106 and 633A.5108, he participated in the district court proceedings, resisting Coe College's petition in each respect.

Following briefing and a hearing on a stipulated record, the district court issued its ruling on January 2, 2019. It held that "the Eppley Foundation's intent expressed in the February 16, 1976 Gift Letter transferring the Paintings to Coe College was to place a permanent restriction on alienation of the Paintings." The court further found that "the permanent restriction on alienation [did] not merit application of Iowa Code section 540A.106 or the doctrine of cy pres, under Iowa Code section 633A.5102, releasing Coe from said restriction."

Coe College appealed, and we retained the appeal.

### III. Standard of Review.

The parties disagree whether this declaratory action is equitable or legal in nature. "Our review of an appeal from a declaratory judgment action is determined by how the case was tried in district court." *Clarke Cty. Reservoir Comm'n v. Robins Revocable Tr.*, 862 N.W.2d 166, 171 (Iowa 2015). Although the attorney general points out that the college filed this case as a law action, an action tried wholly in equity will be subject to a de novo standard of review even if it was filed at law. *See Passehl Estate*

*v. Passehl*, 712 N.W.2d 408, 413–14 (Iowa 2006).  Here, the court did not rule on evidentiary objections; indeed, the court did not need to because the case was tried on a stipulated record.  By contrast, in *Salsbury v. Northwestern Bell Telephone Co.*, we reviewed at law a determination that a charitable subscription was binding, where the matter was tried at law— i.e., objections were made and ruled on.  221 N.W.2d 609, 609–11 (Iowa 1974) (en banc).

In addition, the relief sought by the parties here was equitable— neither party sought damages or a declaration that damages were not due. *Cy pres* is an equitable doctrine, so in deciding whether it applies, our review is de novo.  *Kolb v. City of Storm Lake*, 736 N.W.2d 546, 552–53 (Iowa 2007).  Lastly, the record consists of stipulated facts in any event. For all these reasons, we apply a de novo standard of review here.

**IV. Analysis.**

**A. Is There a Restriction on Alienation of the Paintings?**  In Iowa,

> [a] donor of property for a charitable use may impose such conditions as he may choose, including a restraint on alienation.  This right is an exception to the prohibition against restraint on alienation.
>
> . . . .
>
> "When the charitable use is created by gift, the donor may impose conditions and limitations which shall prevent the diversion of the trust estate from the uses upon which the estate was granted, either by the voluntary or involuntary act of the donee. . . .  The question is wholly one of construction."

*Sisters of Mercy of Cedar Rapids v. Lightner*, 223 Iowa 1049, 1060–61, 274 N.W. 86, 92–93 (1937) (quoting *Mills v. Davison*, 35 A. 1072, 1074 (N.J. 1896)).

For example, almost a century ago we considered another case involving both Coe College and putative gift restrictions.  *See generally*

*Lupton v. Leander Clark Coll.*, 194 Iowa 1008, 187 N.W. 496 (1922). Leander Clark gave $50,000 to what was then Western College in Tama, requiring that (1) the donation be matched by another $100,000 in gifts, (2) the name of the college be changed to Leander Clark College, and (3) the whole $150,000 "shall constitute a permanent endowment fund, the principal of which shall be protected and forever held sacred as such, and no part of it shall ever on any pretense, or in any emergency, be pledged or hypothecated for any purpose . . . ." *Id.* at 1010–11, 187 N.W. at 497–98. Years later, Leander Clark College was no longer able to support itself as an independent educational institution and agreed to merge with and transfer the endowment fund to Coe College. *Id.* at 1012, 187 N.W. at 498. A lawsuit followed. *Id.*

We reasoned as follows:

> It is to be observed that the written proposal, in which the terms and conditions of the donation were fully stated, contains no provision for a forfeiture or reversion of the fund to his estate, nor does it provide for any other disposition thereof, in the event Leander Clark College should cease to exist and function as an institution of learning. Gifts of the character in question for the promotion of education come within the acknowledged definition of gifts to charity, and the first important question in dealing therewith is to ascertain the true intention of the donor. This intention must be found from the instrument itself, and the facts and circumstances surrounding its execution and the making of the gift.

*Id.* at 1013–14, 187 N.W. at 498–99. Ultimately, we ruled that the endowment belonged to Coe College, concluding that

> the provision of Leander Clark that the college should bear his name was a mere incident to a broader and more generous purpose: that of assisting to found and perpetuate a fund, to be so invested and managed as to yield an annual income, to be used for the better education of young men and women who might desire to take advantage of the opportunity offered by the maintenance of such an institution as the college in question.

*Id.* at 1016, 187 N.W. at 500. We specifically noted the absence of any forfeiture or reversion provision in the original gift. *Id.* at 1013–18, 187 N.W. at 498–500.

Somewhat analogously, Coe College argues now that the "permanent home" language does not restrict the college's outright ownership of the paintings. "Permanent" in its view contrasts with "temporary." The paintings were being given to the college *permanently*. Coe College notes the Eppley Foundation was a sophisticated entity that drafted the gift letter itself. It points out that no trust was established, no funds were provided to the college to maintain and preserve the paintings, no inalienability language was included in the gift letter, and the letter made no provision for reversion or other disposition of the paintings if they ceased to be hung in the Stewart Memorial Library. Also noteworthy, perhaps, is that for forty years the paintings were carried on the college's books as an unrestricted gift. In addition, according to the college, the Eppley Foundation's mission was to support charities through grants and donations, not to disseminate art.

On the other hand, the attorney general emphasizes that the same sentence in the letter that gave the paintings to Coe College said "that this would be their permanent home, hanging on the walls of Stewart Memorial Library." Also, the letter provided detailed specifications for a marble and bronze plaque to accompany the gift of the paintings, which included a bust of Eppley. Although the paintings have occasionally been loaned to other institutions and their precise display location has changed, they remain hanging today in the Stewart Memorial Library with the original plaque.

Ours is not the first case dealing with gift restrictions on art. In *Museum of Fine Arts v. Beland,* a will had bequeathed several paintings to

a charitable trust, with ownership to "be vested permanently and inalienably" therein. 735 N.E.2d 1248, 1250 (Mass. 2000). The will also directed the trustees to offer the paintings "for purposes of exhibition to the Museum of Fine Arts in the City of Boston," where in fact some were displayed and some were kept in storage. *Id.* Years later, the trust sought to sell some of the paintings that were being stored. *Id.* The Massachusetts Supreme Judicial Court held that no such authority existed:

> An effort to determine Wolcott's intent by extrinsic evidence is unnecessary because the provisions of the bequest are not ambiguous. Paragraph 5 of the bequest states: "The ownership and control of the pictures shall be vested permanently and inalienably . . . in [the] Trustees." The judge correctly interpreted the meaning of the words in this paragraph by the application of commonly accepted rules. Contrary to the trustees' assertions, the judge did not "overlook" a secondary meaning of the term "inalienable." The contention that Wolcott must have intended the word "inalienable" to be used in the bequest the same way as the word had been used in the Declaration of Independence is not persuasive. The judge properly concluded that "the phrase 'permanently and inalienably' in the will means exactly what it says—the Trustees are to have *permanent* possession and control of the paintings" (emphasis original). The bequest makes clear that the paintings may not be sold by the trustees.

*Id.* at 1251 (footnote omitted) (citations omitted). Although Coe College distinguishes the *Beland* case on the ground that the bequest there used the term "inalienably," the larger point is that the Massachusetts court applied some "commonly accepted rules" of interpretation to the words used when the gift was made.

A more recent unpublished Massachusetts trial court case involved the famed artist Norman Rockwell. *Rockwell v. Trs. of the Berkshire Museum,* No. 1776CV00253, 2017 WL 6940932 (Mass. Super. Ct. Nov. 7, 2017). In that case, an injunction was sought barring the Berkshire

Museum from selling any of its collection of Rockwell paintings. *Id.* at *1. The court denied relief. *Id.* at *19. In part, it reasoned as follows:

> In 1958 and again in 1966, Norman Rockwell gave certain paintings to the Museum without declaring any trust. Shortly after Rockwell donated the first painting, he received a letter from Stuart Henry, the Museum's director, accepting the paintings and stating that they were to be part of the Museum's "permanent collection." The Museum has attached affidavits, which the Attorney General has not contradicted, stating that "permanent collection" is and has long been museum parlance for objects accessioned by the museum and implies no actual permanency. These affidavits persuade the court that the phrase "permanent collection" should be accorded this specialized meaning, which would have been well-known by Rockwell and second nature to Henry. Accordingly, Henry's letter does not support the existence of a contemporary declaration by Rockwell that the paintings were to stay with the museum forever.

> As the parties generally acknowledge, deaccession of artwork was not commonplace at the time of either of Rockwell's gifts. To the extent that may bear on the terms of a purported trust, it gives the court little reason to believe that, by gifting his paintings to the Museum without any express restriction, Rockwell nonetheless restricted the Museum from deaccessioning his work. If deaccessioning was so unheard of that Rockwell would not have thought to have restricted the Museum's right to deaccession his artwork, it suggests he did not restrict the Museum's rights in that fashion. On the other hand, if Rockwell and the Museum generally understood the possibility of deaccessioning, Rockwell's failure to expressly restrict the Museum from doing so suggests that restricting the gifts was not his intent.

*Id.* at *15 (footnotes omitted) (citation omitted). Arguably, the *Rockwell* case supports Coe College's view that "permanent" does not mean "inalienable." However, the relevant language there was "permanent collection," not "permanent home," and we have to read words in their entire context.

A New York trial court opinion also sheds light on how the terms and conditions of art donations are interpreted. In *Dennis v. Buffalo Fine*

*Arts Academy*, a museum sought to "deaccession" (or, in common parlance, "sell") certain older works of art to "focus on maintaining a world-renowned modern and contemporary art museum." No. 2007–2220, 2007 WL 840996, at *1 (N.Y. Sup. Ct. Mar. 21, 2007). In rejecting a court challenge to this plan, the court found, in part,

> The Board is empowered . . . to sell property which was donated or bequeathed to the corporation. This power is limited by an individual's right to specifically restrict the alienability of an item which he or she donates. Both Mr. Foreman and Mr. Michael's donations do not restrict the Board's right to sell these items. First, there is no evidence produced by petitioners that Mr. Foreman himself (i.e., not his family), specifically limited the purpose for which the Shiva was given. Second, the will of Mr. Michael contains no express provision limiting the rights of the Academy to sell his donations. This court agrees with a determination by the Attorney General's office, that the will needed to contain an explicit perpetual limit on the right to sell the item in order for the Board to have violated the donor's intent.

*Id.* at *4. Although the court did not restate the precise language that the two donations involved, it did speak in terms of a "specific[] limit" or "an explicit perpetual limit" on resale. *Id.* Potentially, that analysis favors the college's position here.

In *Lord v. Society for the Preservation of New England of Antiquities, Inc.*, the Maine Supreme Judicial Court confronted a will that bequeathed a painting to the Society "for use only in the 'Parson Smith House.'" 639 A.2d 623, 623 (Me. 1994). Some years later, the Society sold the house and moved the painting to one of its other historic sites. *Id.* at 624. The Maine court ruled for the Society, reasoning,

> The Lords argue that the failure to construe the phrase "for use only in the Parson Smith House" as a condition results in an unacceptable interpretation of it as surplusage. While we recognize that the phrase "for use only in the Parson Smith House" demonstrates Mrs. Stephan's *strong preference* that "the Phyllis" remain in the Parson Smith House, we cannot say it is sufficient to create a *legal obligation* that it remain in the Parson Smith House.

*Id.* at 625.

The Restatement (Third) of Property addresses the subject of gift restrictions and donative intent. It provides, "The controlling consideration in determining the meaning of a donative document is the donor's intention. The donor's intention is given effect to the maximum extent allowed by law." Restatement (Third) of Prop.: Wills & Other Donative Transfers § 10.1, at 276 (Am. Law Inst. 2003). The Restatement adds, "In seeking to determine the donor's intention, all relevant evidence, whether direct or circumstantial, may be considered, including the text of the donative document and relevant extrinsic evidence." *Id.* § 10.2, at 278. "The text of a donative document must be read in its entirety." *Id.* cmt. *b*, at 278.

"Extrinsic evidence of the circumstances surrounding the execution of the donative document that might bear on the donor's intention, directly or circumstantially, may always be considered." *Id.* cmt. *d*, at 279–80. Furthermore, "[a] significant element of the surrounding circumstances may be whether the drafter of the document was a layperson (usually the donor) or a person experienced in the use of legal or other specialized terminology (usually the donor's lawyer)." *Id.* cmt. *e*, at 280.

Although we have not previously approved these portions of the Restatement (Third) of Property, we have applied that Restatement in other contexts. *See, e.g.*, *DuTrac Cmty. Credit Union v. Radiology Grp. Real Estate, L.C.*, 891 N.W.2d 210, 218–20 (Iowa 2017) (applying Restatement (Third) of Property: Servitudes § 7.10 (Am. Law. Inst. 2000)); *Stew-Mc Development, Inc. v. Fischer*, 770 N.W.2d 839, 847 (Iowa 2009) (applying Restatement (Third) of Property: Servitudes § 4.1(1)); *Gray v. Osborn*, 739 N.W.2d 855, 861 (Iowa 2007) (applying Restatement (Third) of Property: Servitudes § 2.2); *Sieh v. Sieh*, 713 N.W.2d 194, 197–98 (Iowa

2006) (applying Restatement (Third) of Property: Wills & Other Donative Transfers § 9.1(c)), *superseded by statute*, 2009 Iowa Acts ch. 52, § 4 (codified at Iowa Code § 633.238 (Supp. 2009)), *as recognized in In re Estate of Myers*, 825 N.W.2d 1, 2 (Iowa 2012). Consistent with the Restatement provisions and official comments quoted above, we believe a heightened emphasis on intent is appropriate when interpreting a gift as opposed to a contract or statute. A gift is the product of *one* actor's intent, not *two* actors as with a contract or *many* actors as with a statute.

Our caselaw appears to have followed the Restatement approach. "It is a well recognized rule, uniformly followed by all courts that gifts to charitable uses and purposes are highly favored in law, and will be most liberally construed to make effectual the intended purpose of the donor." *In re Small's Estate*, 244 Iowa 1209, 1225, 58 N.W.2d 477, 485 (1953).

> In general, the donor's intention *is to be determined from the instrument itself and the attendant circumstances. The terms used are not to be measured separately, but each is to be considered in its relation to the entire provision, and the general meaning of each restricted by its associations, and made subordinate to [its] main purpose. . . .* To aid in the construction, extrinsic evidence of the circumstances is usually admissible[.]

*Id.* at 1228, 58 N.W.2d at 486 (quoting 14 C.J.S. *Charities* § 11).

Applying those principles here, on our de novo review, we find that the Eppley Foundation made a gift subject to the restriction that the paintings would remain permanently in the Coe College library.[1] To this

---

[1]The district court found no barrier to *temporary* loans of the paintings to other educational or charitable institutions:

> Temporarily removing the Paintings from the Stewart Memorial Library and loaning out the Paintings to other educational or charitable institutions is not contrary to the donor's intent. This interpretation both allows Coe the opportunity to generate income for the maintenance of the Paintings and further its educational mission and is consistent with the stated purposes of both the Eppley Foundation and Coe.

court, the words "permanent home" mean not merely that the paintings would belong permanently to Coe College but that they would be housed there permanently. A critical factor is that the same letter gifting the paintings also described in detail how Eppley would be recognized along with the paintings. Thus, the Eppley Foundation directed that there would be a marble and bronze plaque memorial including two bronze plates and a bust of Eppley. Four paragraphs in the Eppley Foundation's 1976 gift letter were devoted to the Eppley memorial, only one to the paintings.

The memorial envisioned by the Eppley Foundation in 1976 remains there today. It prominently honors Eppley himself while explaining that the paintings are a gift to Coe College. We think it is fair to infer that the donor intended a symbiotic relationship between the two—the paintings and the commemoration of Eppley. Such a relationship depends on the paintings remaining at Coe College. The effort to honor Eppley would cease to have the same significance without the presence of the Grant Wood artwork.[2]

**B. Should Any Restriction Be Modified or Removed Under Iowa Code Section 540A.106 or 633A.5102?**

1. *The Uniform Prudent Management of Institutional Funds Act.* Our general assembly enacted the Uniform Prudent Management of

---

The Gift Letter and surrounding circumstances present no evidence that the Paintings were to be a financial burden on Coe. Nor is there any evidence that the Eppley Foundation intended that the Paintings were only to be used as library decorations. If the Eppley Foundation intended that the Paintings remain in the library forever, for all time, never to be removed, it could have said as much.

No issue is raised on appeal as to this portion of the district court's order.

[2]As the district court put it, "The memorial plaque commemorating the gift of the Paintings would be useless without the subject paintings present and the text would be nonsense in a location other than Coe on account of the language 'given to Coe College by the Eugene C. Eppley Foundation.'"

Institutional Funds Act (UPMIFA) in 2008. *See generally* 2008 Iowa Acts ch. 1066 (codified at Iowa Code ch. 540A (2009)). This is the first time this court has been asked to interpret any part of the UPMIFA. The UPMIFA provides three options to release or modify restrictions on management, investment, or purpose of trusts. Iowa Code § 540A.106 (2017). Option one is donor consent. *Id.* § 540A.106(1). It is inapplicable here because the Nebraska Secretary of State dissolved the Eppley Foundation in 1977; hence, the donor no longer exists. We turn therefore to options two and three.

Option two states,

> The court, upon application of an institution, may modify a restriction contained in a gift instrument regarding the management or investment of an institutional fund if the restriction has become impracticable or if, because of circumstances not anticipated by the donor, the restriction will defeat or substantially impair the accomplishment of the purposes of the institutional fund. The institution shall notify the attorney general of the application, and the attorney general shall be given an opportunity to be heard. Any modification must be made in accordance with the donor's probable intention.

*Id.* § 540A.106(2). Option three provides,

> If a particular charitable purpose or a restriction contained in a gift instrument on the use of an institutional fund becomes unlawful, impracticable, or impossible to fulfill, the court, upon application of an institution, may modify the purpose of the fund or the restriction on the use of the fund in a manner consistent with the charitable purposes expressed in the gift instrument. The institution shall notify the attorney general of the application and the attorney general shall be given the opportunity to be heard.

*Id.* § 540A.106(3).[3]

---

[3]The common law doctrine of *cy pres* is mentioned in a separate subsection of the UPMIFA:

> This section does not limit the application of the judicial power of cy pres or the right of an institution to modify a restriction on the management,

As the foregoing language indicates, options two and three are available for "institutional funds." An "institutional fund" is defined as "a fund held by an institution exclusively for charitable purposes," and does not include "[p]rogram-related assets," "fund[s] held for an institution by a trustee that is not an institution," or "fund[s] in which a beneficiary that is not an institution has an interest, other than an interest that could arise upon violation or failure of the purposes of the fund." *Id.* § 540A.102(5). A "program-related asset," on the other hand, is "an asset held by an institution primarily to accomplish a charitable purpose of the institution and not primarily for investment." *Id.* § 540A.102(7).

The attorney general argues that the paintings are program-related assets, not an institutional fund. He quotes the following article from the website of the Uniform Law Commission:

> For example, assume that a donor gave a painting to a museum organized as a nonprofit corporation and not as a trust. The donor stipulates that the museum must always display the painting as part of its collection, that the painting cannot travel to other museums, and that the museum cannot sell the painting. The painting is a program-related asset, so UPMIFA does not apply to the painting. If the museum needs to modify the restriction, perhaps to permit the painting to be exhibited by other museums as a way to raise money to care for the painting, the museum may be able to use the common law doctrine of cy pres to request the modification. The museum will not be able to rely on the statutory authority for judicial modification provided under UPMIFA. The fact that the painting is a program-related asset does not affect the donor restriction, but it may affect the availability of court-ordered modification.

*UPMIFA Program-Related Assets Article*, Uniform Law Commission, https://www.uniformlaws.org/viewdocument/upmifa-program-related-

---

investment, purpose, or use of a fund as may be permitted under the gift instrument or by law.

Iowa Code § 540A.106(7).

assets-artic?CommunityKey=043b9067-bc2c-46b7-8436-07c9054064a3 &tab=librarydocuments (last visited Nov. 6, 2019) (follow "Download" link).

The attorney general's quotation only goes so far because this case involves a college, not an art museum. One thoughtful article maintains that university art collections can be considered instrumental funds, depending on the context. *See* Linda Sugin, *Lifting the Museum's Burden from the Backs of the University: Should the Art Collection Be Treated as Part of the Endowment?*, 44 New Eng. L. Rev. 541, 557–58 (2010). After all, Coe College is an educational institution, and the paintings are kept within the college library, not in a separate on-campus art museum.

But even if the Wood paintings were deemed an institutional fund, the college would still need to demonstrate that the restriction has become impracticable or impossible or, because of circumstances not anticipated by the donor, the restriction will defeat or substantially impair the accomplishment of the purposes of the institutional fund. *See* Iowa Code § 540A.106. As we will now see, this overlaps to some extent with what the recipient of a charitable gift must prove to invoke *cy pres.*

2. *The common law doctrine of* cy pres. The *cy pres* doctrine refers to "[t]he equitable doctrine under which a court reforms a written instrument with a gift to charity as closely to the donor's intention as possible, so that the gift does not fail." *Cy Pres*, *Black's Law Dictionary* (11th ed. 2019). The doctrine is "a liberal rule of construction used to carry out, not defeat, the [donor's] intent." *In re Tr. of Rothrock*, 452 N.W.2d 403, 406 (Iowa 1990) (citing *Simmons v. Parsons Coll.*, 256 N.W.2d 225, 227 (Iowa 1977)). We stated in *Simmons*,

> Cy pres is a doctrine which literally means "as near as may be." It is applicable only to charitable trusts and then only when the trust established by a [donor] fails, no alternative disposition of the property has been made, and the

general trust purposes may be accomplished by permitting it to be administered in a way different from, but closely related to, the [donor's] plan.

256 N.W.2d at 227 (quoting *Hodge v. Wellman,* 191 Iowa 877, 882, 179 N.W. 534, 536 (1920)).

Our general assembly codified this doctrine into positive law in 1999. 1999 Iowa Acts ch. 125, § 86 (originally codified at Iowa Code § 633.5102 (2001)).[4] Iowa Code section 633A.5102 (2017), "Application of cy pres," provides,

Unless the terms of the trust provide to the contrary the following apply:

1. A charitable trust does not fail, in whole or in part, if a particular purpose for which the trust was created becomes impracticable, unlawful, or impossible to fulfill.

2. If a particular charitable purpose for which a trust was created becomes impracticable, unlawful, or impossible to fulfill, the court may modify the terms of the trust or direct that the property of the trust be distributed in whole or in part in a manner best meeting the settlor's general charitable purposes. If an administrative provision of a charitable trust becomes impracticable, unlawful, impossible to fulfill, or otherwise impairs the effective administration of the trust, the court may modify the provision.

"Unless the statute directs otherwise, we will construe section 633A.5102 according to the legislature's intent as aided by our precedent regarding the common law doctrine of cy pres." *Kolb,* 736 N.W.2d at 555.

"Section 633A.5102 has not changed the basic tripartite test." *Id.* Unless the trust directs otherwise, we require the following: "(1) a charitable trust; (2) a specific trust purpose that is illegal, impractical, or impossible; and (3) a general charitable intention by the donor." *Id.*

At the outset, we must determine if the explicit terms of the gift letter disallow the application of *cy pres.* Here, the explicit terms of the gift letter

---

[4]Iowa Code sections 633.1101–.6308 were transferred to chapter 633A in 2005. *See* 2005 Iowa Acts ch. 38, § 54.

state that "[t]he Eppley Foundation Board of Directors [has] approved that the Grant Wood paintings be given to the Coe College and that this would be their permanent home, hanging on the walls of Stewart Memorial Library." There is nothing in this language to indicate that the gift should fail in the event that the display of the paintings becomes impracticable, unlawful, or impossible. *See Georgia O'Keeffe Found. (Museum) v. Fisk Univ.*, 312 S.W.3d 1, 18 (Tenn. Ct. App. 2009) (remanding for the application of *cy pres* and noting the absence of any "express divesting clause" in Georgia O'Keeffe's gift of paintings to Fisk University). Furthermore, there is nothing in these terms to indicate that modification is prohibited. Thus, the terms of the gift do not bar the application of section 633A.5102.

Under the common law, we then ask whether the Eppley Foundation "anticipated the possible failure of the trust and [if it] has made alternative disposition of [its] property to meet that contingency." *Kolb*, 736 N.W.2d at 555 (quoting *Simmons*, 256 N.W.2d at 227). If so, the application of *cy pres* is inappropriate. *Id.* Again, the gift letter does not indicate that the Eppley Foundation anticipated the failure of the restricted gift of the paintings, and the gift letter did not provide for alternative disposition. Accordingly, the doctrine of *cy pres* is not precluded from application in the case before us.

Because we have construed the gift letter to impose restrictions on Coe College's ownership rights in the paintings, the letter may be deemed to establish a charitable trust even though it contains no magic trust language. *See* Restatement (Second) of Trusts § 397 cmt. *e*, at 287 (Am. Law Inst. 1959). A trust established to display paintings of a world-renowned local artist in the library of a nonprofit educational institution where other artworks by the same artist are displayed demonstrates a

charitable purpose. *See* Iowa Code § 633A.5101(1) (noting a charitable trust may be created for any purpose "beneficial to the community"). Art brings beauty to our world, and Grant Wood's style situated in Midwest regionalism and illustrative of rural American themes is perhaps of more importance and allure when displayed in the city where he spent much of his youth. "Thus, the property was held by [Coe College] for a charitable purpose and is a charitable trust." *Kolb*, 736 N.W.2d at 556 (quoting *In re Tr. of Rothrock*, 452 N.W.2d at 405).

Next, we must determine if a specific charitable purpose of the donated paintings has become impractical, illegal, or impossible. There is no claim of illegality; the parties and the district court have focused solely on whether honoring the restrictions has become impracticable or impossible. As this court has stated, there is "no precise definition of the standard" and "whether something has become impossible or impracticable is up to the 'particular facts of each case.' " *Id.* at 556 (quoting Nancy A. McLaughlin, *Rethinking the Perpetual Nature of Conservation Easements*, 29 Harv. Envtl. L. Rev. 421, 465 (2005)). A trustee or donee may invoke *cy pres* despite having caused the impossibility or impracticability, *id.* at 557, but not "merely to serve trustee convenience," *Howard Sav. Inst. of Newark v. Peep*, 170 A.2d 39, 47–48 (N.J. 1961).

We are not convinced that implementing the Eppley Foundation's specific charitable purpose of honoring Eppley and dignifying and beautifying the Coe campus through the display of the Wood paintings in the Stewart Memorial Library has become impossible or impracticable. This is not a situation like *Kolb* where the donated items had to be moved because of a "vital and necessary" economic development project. 736 N.W.2d at 551 (holding that the doctrine of *cy pres* should be utilized to

allow relocation of memorial gardens and a fountain in favor of a substantial economic revitalization project); *see also In re Stuart's Estate*, 46 N.Y.S.2d 911, 915–16 (Sur. Ct. 1944) (finding that cultural changes between 1891 and 1944 rendered the requirement that an art collection not be exhibited on Sundays impracticable). Coe College has not indicated that it presently wants to sell or even relocate any of the paintings.

Furthermore, although Coe has demonstrated that its endowment has dropped by $5.4 million due to the reclassification of the paintings as a restricted gift, it has not offered proof of actual financial difficulties resulting therefrom.[5] Those facts might well present a different case. *Cf. Georgia O'Keeffe Found.*, 312 S.W.3d at 19–20 (remanding for the application of *cy pres* to a private university's application for permission to sell two paintings out of a collection given to it by Georgia O'Keeffe); *In re Barnes Found.*, No. 58,788, 2004 WL 2903655, at *17–18 (Pa. Ct. Com. Pl. Dec. 13, 2004) (allowing the Barnes Foundation to move its art collection to Philadelphia after finding that it could not raise enough money through the sale of nongallery assets to keep the collection in its existing location and achieve fiscal stability).

To put it another way, the problem here is not that the gift recipient no longer wants a portion of the gifted assets and would prefer cash. *Cf. Beland*, 735 N.E.2d at 1251; *Rockwell*, 2017 WL 6940932, at *2; *Dennis*, 2007 WL 840996, at *1; *In re Barnes Found.*, 2004 WL 2903655, at *17–18; *Georgia O'Keeffe Found.*, 312 S.W.3d at 4. Nor is it that the gift has to be relocated because of other circumstances. *Cf. Kolb*, 736 N.W.2d at 551–

---

[5]All we know from the stipulated facts is that "reclassification of the Paintings as 'permanently restricted assets' results in an adverse impact on the value of the College's endowment fund, which in turn adversely impacts the College's financial position for Federal educational institution reporting requirements."

25; *Lord,* 639 A.2d at 624; *In re Barnes Found.*, 2004 WL 2903655, at \*17–18.

Instead, due to an unanticipated *increase* in the value of Grant Wood's art, the paintings now are worth millions of dollars and would make up seven percent of the college's endowment, rather than the original one percent. While we sympathize with difficulties faced by small private colleges in a trying financial environment, it is difficult to see this fortuitous increase in the value of an asset as rendering the original restrictions impracticable or impossible to meet *on the present record.* On a different and more robust record, lifting the restrictions on alienability of some or all the paintings might be an appropriate exercise of *cy pres.*

**V. Conclusion.**

For the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED.**